**ELLIOTT**

v.

**GENERAL DRIVERS, WAREHOUSE-MEN & HELPERS, LOCAL UNION NO. 968 et al.**

**Civ. A. No. 8006.**

United States District Court,
S. D. Texas, Houston Division.

May 7, 1954.

Chas. M. Henderson, Washington, D. C., and Dr. Edwin A. Elliott, Fort Worth, Tex., for petitioner.

L. G. Clinton, Jr., Houston, Tex., for respondent Union.

Robert C. Eckhardt, Houston, Tex., for respondent Miller.

CONNALLY, District Judge.

This is an action by Edwin A. Elliott, National Director of the Sixteenth Region of the N. L. R. B., for temporary injunction to retain the status quo pending final determination by the Board with respect to a controversy presently pending before it. Jurisdiction is afforded by Section 10(*l*) of the Labor Management Relations Act of 1947, 61 Stat. 136, 29 U.S.C.A. § 141 et seq. The employer is Otis Massey Co., Ltd., a partnership ("Massey" hereafter), which company filed with the Board charges that the defendants have been and are engaged in unfair labor practices, as defined in 8(b) (4) (A) of the Act. The charges were investigated by the petitioner, and as a result thereof this action was instituted to restrain the alleged unfair labor practices until final adjudication by the Board.

The facts are largely without dispute. Massey is engaged in the business of selling and installing insulation and relating lines of building materials. Its principal office and warehouse is located at 201 Hutchins Street, this City. Most of its purchases of materials and a small percentage of its sales move in interstate commerce, and Massey is engaged in commerce within the terms of Sections 2(6) and (7) of the Act. Some 30 percent of Massey's business consists of selling such materials in wholesale quantities from its place of business at 201 Hutchins. The remaining 70 percent consists of subcontracting in the construction field, whereby, with its own employees, it installs such insulation, acoustical materials, flooring, etc.

The Respondent, General Drivers, Warehousemen and Helpers Local 968,

A. F. of L. ("Union" hereafter), is a labor organization within terms of the Act, with its principal office in this City, where it is engaged in its normal activity. M. W. Miller heretofore has been duly appointed as trustee of said Union, and is and has been in charge and control of its affairs at all times material hereto.

Said Union heretofore has been certified as bargaining agent for the four truck drivers and warehousemen employed by Massey. A dispute arose between Massey and the Union over the terms of a proposed new contract. On January 13, 1954, the negotiations then in progress broke down, and the Respondent Union placed pickets around Massey's premises at 201 Hutchins. It may be observed at this point that all parties concede the legitimacy of the labor dispute and the right of the Respondent Union to primary picketing in connection therewith. Such picketing at Massey's principal place of business has continued until the date of trial.

In connection with its work, Massey has procured, and presently is engaged in the performance of, three subcontracts which are of present concern. Tellepsen Construction Company ("Tellepsen") is the general contractor in the construction of St. Luke's Hospital in this City. This is a construction project involving about $4,500,000. C. Wallace Plumbing Company ("Wallace") holds a subcontract under Tellepsen for plumbing and mechanical construction on this job. Massey has a subcontract under Wallace for the insulation.

Manhattan Construction Company ("Manhattan") has the general contract for the construction of the University of Texas Dental Clinic, approximately a $10,000,000 job. Wallace likewise has the plumbing and mechanical subcontract there, and Massey similarly holds a subcontract under Wallace for the insulation.

O'Rourke Construction Co. ("O'Rourke") has the general contract for the construction of Battelstein's Service Center, a contract of substantial size. Massey has a subcontract under O'Rourke for insulation.

In the performance of these and similar subcontracts, Massey employs insulators, roofers, carpenters, lathers and other craftsmen. Each of these crafts is represented by its own union, and none of them presently is engaged in any dispute with Massey, Wallace, or the three general contracting firms above mentioned. None of such other craftsmen is represented by the Respondent Union. These craftsmen may from time to time have occasion to visit 201 Hutchins, but in the main go directly from their homes to work at the job sites.

The truck drivers-warehousemen who are represented by Respondent Union are employed in and around the warehouse at 201 Hutchins, and in driving trucks to and from that address. In the course of their duties, such truckdrivers-warehousemen from time to time make deliveries of materials to the job sites where the insulators or other craftsmen are engaged in the performance of the Massey subcontracts. On such occasions, they are present at the job site only long enough to unload the materials which they deliver. They then return to the warehouse or perform other duties.

Since about January 18, 1954, and to the date of trial, Respondent Union intermittently has picketed the St. Luke's Hospital, the University of Texas Dental Clinic, and perhaps other job sites where Massey had a subcontract and where Massey craftsmen were employed. In each of the instances concerning which testimony was offered, I find that the pickets carried signs which indicated that their dispute was with Massey only, and not with the general or other subcontractors. Respondent Union made an effort to secure permission to go upon the construction project in order to place the pickets close to or around the immediate area where the Massey insulators were working. On being unable to secure such permission, the pickets took up their positions upon streets or thoroughfares which were as close as they rea-

sonably were able to locate without trespassing. While the locations thus chosen did not include all of the possible entrances to the job sites, they included some; and the presence of the pickets, together with the legend on the signs which they carried, were open and obvious to all of the employees there engaged.

This picketing occurred only while Massey *insulators* or *other craftsmen* were present and working. While there were instances during the course of the picketing that a Massey truck and one or more *truck driver-warehousemen* were present at the job site making deliveries, this was only at irregular and brief intervals; and the presence of the pickets at the job site was in no way correlated with the presence of the truck drivers-warehousemen. As a direct result of this picketing, on January 27th and again on January 29th, 1954, all, or substantially all, of the workmen walked off of the job, both at the St. Luke's Hospital site and at the University of Texas Dental Clinic site. This included not only the employees of Massey, but of the general contractor and of all of the subcontractors. In each instance, the job was closed down for that day.

It is contended that such picketing as described above is secondary in nature, condemned by Section 8(b) (4) (A), rather than primary, as protected by Section 13. In my opinion it is secondary, and should be enjoined. It constituted an inducement and encouragement of the employees of the general contractors mentioned above, and of the various subcontractors, collectively to strike or to abandon their work in concert, in order to induce their employers to cease doing business, or working side by·side, with Massey. It was intended and designed to have that effect.

 It has long been established by opinions of the Courts and of the N.L.R.B. that the usual situs of a labor dispute is the premises of the primary employer, and that a union is justified in picketing that situs despite the fact that neutral employers who have reason to go upon or about such premises may feel the impact of such picketing, Pure Oil Co., 84 N.L.R.B. 315; Ryan Const. Co., 85 N.L.R.B. 417; N. L. R. B. v. International Rice Milling Co., 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1284.

Later in Schultz Refrigerated Service, Inc., 87 N.L.R.B. 502, and in Moore Dry Dock Co., 92 N.L.R.B. 547, the Board had occasion to deal with the peculiar circumstance wherein the primary employer had no premises within reach of the union. In the Schultz case, the primary employer operated a fleet of refrigerated trucks in New York City. Previously, it had operated from a terminal within New York, and used members of the union (New York truck drivers) for that purpose. When the primary employer abandoned its New York terminal and operated only· from a New Jersey terminal, it replaced its New York Local drivers with members of a New Jersey Local. Hence a dispute resulted between the New York drivers and the employer. Under these circumstances, picketing of the trucks themselves while in New York and while making deliveries to customers was held primary, the Board emphasizing, as the basis for such holding, (1) that this was the *only* place of business of the primary employer located in New York City; and that the picketing was within the immediate vicinity of the trucks involved (as distinguished from the place of business of the customer); and (2) the truck was the site of the aggrieved employees' own place of employment. In Moore Dry Dock, strongly relied upon by the Union as announcing the "ambulatory situs" theory which it urges here, the Board further recognized the exceptional nature of this doctrine, stating "in the usual case the situs of a labor dispute is the premises of a primary employer". Applying the Schultz theory to a vessel of the primary employer, the Board there held that, the primary employer having no dock or other place within the vicinity for the repair of the vessel "Phopho", the vessel itself, though ambulatory in nature, was

the situs of a labor dispute between the owner, as primary employer, and *the seamen normally employed on said vessel.*[1] Where two such conditions are present (namely, the absence of premises of the primary employer, where the union would have a fair chance to "get at" him, and where the ambulatory situs is in fact the place of employment of the aggrieved employees), the Board laid down four conditions, which, if met, would make picketing at or near the premises of a secondary employer of a primary nature. These requirements will be alluded to hereafter.

That such requirements must be met before the Schultz and Moore Dry Dock doctrine applies is confirmed by opinions of the Board in Western, Inc., 93 N.L.R.B. 336 and Washington Coca Cola Bottling Works, Inc., 107 N.L.R.B., No. 104. In the former, picketing by members of the meat cutters' local of their employers' trucks, while such trucks were making deliveries to customers' places of business and parked adjacent thereto, was condemned as a violation of 8(b)(4)(A). Even though the picketing was closely confined to the truck itself, the Board observed: "These facts are distinguishable from those in Schultz Refrigerated Service, Inc., 87 N.L.R.B. 502, where the trucks picketed were themselves the situs of the labor dispute. Here the delivery trucks were not themselves the situs of any labor dispute and Western's premises, which were the situs of the primary dispute, could readily be picketed". (Footnote 336). In Washington Coca Cola Bottling Wks., Inc., the Board likewise condemned as constituting a secondary boycott, picketing of coca cola trucks and, while the driver was present, of the premises of the customer, by members of the drivers' union. In denying the application of the Schultz and Moore Dry Dock doctrine the Board states:

"The Respondent (Union) advances the Schultz and Moore Drydock cases in defense of the 'On Strike' picketing. Unlike the instant proceeding, the Schultz case involved picketing of trucks belonging to a company engaged in the transportation business which had no permanent establishment where the trucks could be picketed within the State in which the labor dispute arose. Similarly in the Moore Drydock case the owners of the ship, which was the situs of the picketing union's dispute with the ship owners, had no permanent berth where the union could publicize the facts concerning its dispute with the ship owners. Here, the Coca Cola plant, which the drivers enter and leave at least 4 times each day, is located in downtown Washington and was picketed by the Respondent Union from the first day of the strike."

Here, it will be observed, the fact that the employer had its principal place of business within easy reach of the Union's pickets precluded picketing of the trucks *even by the striking truck drivers.*

The Union relies upon N. L. R. B. v. Service Trade Chauffeurs', Etc., 2 Cir., 191 F.2d 65, and Getreu v. Brotherhood of Painters, Etc. (24 Labor Cases § 67,906) as authority for applying the Moore Dry Dock doctrine to the facts of the present case. In my opinion, these cases are not subject to this interpretation. In Service Trade Chauffeurs, the Court of Appeals for the Second Circuit remanded to the Board, for further consideration in view of the Schultz and Moore Dry Dock opinions, the controversy between the employer and Union there involved which had been determined by the Board at an earlier date, with the direction that the Board determine whether the case fell within the

---

[1]. In the language of the Board, "Similarly, we hold in the present case that as the Phopho was the present place of employment of the seamen, it was the situs of the dispute between Samsoc and the respondent over working conditions aboard that vessel". (At page 549 of 92 N.L.R.B.).

scope of the mentioned doctrine. The Board thereafter found that the standards were not met, and its order that the Union cease picketing the secondary employer was enforced, 2 Cir., 199 F.2d 709. The Getreu opinion does go further in applying the Schultz and Moore Dry Dock theory than is warranted by the language of those two opinions, but does not go so far as the Union would have me go here. Despite the fact that the employer maintained within the city its warehouse where it did a large volume of business, and where it was subject to being picketed, the Getreu opinion indicates that picketing of a construction. job, where the employer was engaged in performance of a subcontract, was permissible primary picketing when limited to the time that the employees of the primary employer were present at the job site, engaged in the primary employer's normal business at that spot, and where the picketing clearly disclosed that the dispute was with the primary employer and further was restricted to an area close to the location of the primary employer's subcontract. The facts there differ from those of the instant case, however, in that the dispute was with the very union whose members were engaged in the performance of the subcontract. Hence there was some justification for holding that the job site where these craftsmen (glazers) were working was the situs of a dispute between the glazers and the employer. This opinion thus would disregard the earlier requirement laid down by the Board that the transitory situs doctrine came into application only when there was no permanent place of business of the primary employer available for picketing. There is still present in Getreu the requirement that the situs picketed be in fact the situs of the dispute or the place of employment of the strikers.

■ Neither of the two requirements is present in the instant case. As stated, it was not the occasional presence of a truck driver upon which the union seeks to peg its claim that this picketing was primary. It was, rather, the presence of the other crafts in the employ of Massey. It is difficult to see how the fact that insulators employed by Massey upon a job site far distant from Massey's place of business would make that job site the situs of a dispute between Massey and his truck drivers. The doctrine for which the Union here contends, carried to its logical conclusion, would permit picketing by any union in connection with its dispute with a primary employer at any spot where that employer had any employee engaged in its normal business, without regard to the fact that such employee and his duties might be entirely unrelated to the union in question and to its dispute with the employer. Such result would show scant regard for the interests of the public or the neutral employer whose interests the Act undertakes to protect. The prohibition against the secondary boycott found in 8(b) (4) (A) would be of little force and effect. Hence, I decline to be the first to give the Act that interpretation.

■ The picketing referred to above in connection with the operations of Massey has a close, intimate and substantial relation to trade, traffic and commerce among the several states and tends to lead to labor disputes burdening and obstructing such commerce. Unless restrained, it may be fairly anticipated that the Respondents will continue and repeat such conduct, or similar conduct, with the view to requiring the general contractors and other subcontractors employed upon the construction jobs mentioned to cease doing business with Massey. In order to preserve the issues for determination of the Board as provided in the Act, it is appropriate, just and proper that, pending final adjudication by the Board of the matter herein involved, the Respondents, and each of them, and their agents, servants, employees and all persons in active concert or participation with them be enjoined and restrained from the commission and continuation of the acts and conduct. described above, acts in furtherance or support thereof, and like or related acts or conduct, commission of which in the

future is likely or may be fairly antici-pated from Respondent's acts or conduct in the past.

Order will enter in the form submit-ted by the plaintiff. Clerk will notify counsel.