225 F.2d 205
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
GENERAL DRIVERS, WAREHOUSEMEN AND HELPERS, LOCAL 968,
International Brotherhood of Teamsters, Chauffeurs,
Warehousemen and Helpers of America, AFL, and M. W. Miller,
Trustee, General Drivers, Warehousemen and Helpers, Local
968 Respondents.
 No. 15305.
 United States Court of Appeals Fifth Circuit.
 Aug. 2, 1955.
 
 Miss Rosanna A. Blake, Atty., N.L.R.B., Silver Springs, Md., Owsley Vose, Asso, Ch. Enf. Br., David P. Findling, Asso. Gen. Cnsl., Marcel Mallet-Prevost, Asst. Gen., Cnsl., N.L.R.B., Washington, D.C., Samuel M. Singer, Attorneys, N.L.R.B., Washington, D.C., for petitioner.
 Chris Dixie, Houston, Tex., Mullinax & Wells, Dallas, Tex., Dixie, Ryan & Schulman, Houston, Tex., for respondents.
 Before RIVES, Circuit Judge, and DAWKINS and DE VANE, District judges.
 RIVES, Circuit Judge.
 
 
 1
 The Board petitions for enforcement of its order issued against respondents on July 22, 1954, based on findings that respondent union and its trustee individually had violated Section 8(b)(4)(A), 29 U.S.C.A. § 158(b)(4)(A), through inducing the employees of certain neutral employers, by means of picketing certain construction projects, to strike in order to force those neutral employers to cease doing business with the Otis Massey Company, the charging party and primary employer with whom the union's dispute arose. The Board's decision and order are reported at 109 N.L.R.B. 61.
 
 
 2
 The material facts found by the Board[1] reveal that the Otis Massey Company is a co-partnership engaged at Houston, Texas, in the distribution and installation of insulation and other building materials; that in January, 1954, it was acting as subcontractor in the installation of certain materials at St. Luke's Hospital, the University of Texas Dental Clinic and Battlestein's Service Center, which three buildings were then undergoing construction at various locations in Houston; that at the first two building locations aforementioned, Otis Massey was a subcontractor of C. Wallace Plumbing Co., which company was in turn a subcontractor of the general contractors, Tellepsen Construction Company and Manhattan Construction Company, and at the last mentioned construction site, Otis Massey was acting as subcontractor for the general contractor, O'Rourke Construction Company; that Massey employed at all three locations various craftsmen, among which were asbestos workers, carpenters and flooring men, all of which were represented in collective bargaining with Otis Massey by their particular craft unions, and none of which were represented by the respondent union.
 
 
 3
 It was further found that Otis Massey also operates a warehouse located several miles from each of the above construction projects, where it employs four truck drivers and warehousemen for whom the respondent union is the certified bargaining representative; that these four employees occasionally deliver building materials to the construction projects, but otherwise have no duties at the building locations; that in January, 1954, a dispute arose between Otis Massey and the respondent union concerning the terms of a bargaining contract applicable only to the four truck drivers and warehousemen, as a result of which the respondent union called a strike on January 13 and commenced picketing the warehouse; that no dispute existed between Otis Massey and respondent or any other union with respect to the various craftsmen employed by it at the three construction projects, but the union nevertheless commenced picketing the construction projects at the same time it began picketing the warehouse;[2] that, except in one or two instances, none of the truck drivers or warehousemen here involved were making deliveries at the construction sites when the picketing occurred, though the various other craftsmen were present and engaged in construction duties on every occasion; that the picketing continued until February 11, 1954, when it ceased as a result of the injunction proceeding mentioned above (footnote 1, supra), and on January 27th and 29th, the various craftsmen working for the neutral contractors, as well as those employed by Otis Massey, engaged in a concerted walk-out from the dental clinic and hospital construction jobs as a result of the picketing; that on January 27 a number of electricians also left the dental clinic job but subsequently returned after the Otis Massey insulators left, and on that same day a work stoppage at the hospital construction site occurred when all craftsmen except the cement finishers quit work.
 
 
 4
 It is undisputed, however, that the pickets at the construction projects carried signs reading: 'General Drivers, Local 968, AFL, On Strike Against Otis Massey'; that on February 11, the day before the hearing in the aforementioned district court injunction proceeding (footnote 1, supra), a notation to 'See our pamphlet' was added to the picket signs, and the pamphlet or handbill referred to, which was distributed by the pickets, expressly advised any interested parties that the respondent union's dispute was with Otis Massey only, and not with any other employer engaged in construction work at the projects, and that the picket line should be considered as directed only toward those locations within the projects where the Otis Massey craftsmen were working.[3]
 
 
 5
 The Board concluded from the above summarized facts that the union's activity in picketing the construction projects violated Section 8(b)(4)(A) of the Act, because it was conducted, 'at least in part,' to force the secondary and neutral employers 'to cease doing business with Otis Massey, by inducing and encouraging the employees of said employers to engage in a strike.' That ultimate conclusion was predicated mainly upon findings, vigorously attacked here, that the drivers and warehousemen involved were employed 'not at the construction projects but at the Otis Massey warehouse,' so that the warehouse location was the sole 'situs of the union's dispute,' and the place where it could 'adequately publicize' its private controversy with Massey without disrupting work of the other neutral employers. In reaching its ultimate conclusion that the union's activity was secondary and unlawful, rather than primary and lawful under the Act, the Board relied strongly on the union's supposed failure to justify its picketing at the common premises as 'harboring the situs of a dispute between a union and a primary employer' under its Moore Dry Dock Co. case, 92 N.L.R.B. 547.[4]
 
 
 6
 Respondents insist the Board's findings, that the warehouse was the sole situs of the dispute and that the picketing was for an unlawful object, are not supported by that substantial evidence on the record considered as a whole here required for enforcement of its order;[5] that the Board is without authority, statutory or otherwise, arbitrarily to make such findings in disregard of contrary, undisputed testimony that the construction sites were among several locations at which Otis Massey conducted its normal business activities, and that the picketing of those sites was justifiably directed solely against that company as the primary employer; and, finally, that the Board's order, under the facts proven, violates respondents' right of free speech, contrary to the First Amendment and is especially unjustified insofar as it purports to hold the individual respondent, Trustee Miller, personally responsible for the alleged 8(b)(4)(A) violation.
 
 
 7
 Section 8(b)(4)(A) of the Act, insofar as here material, makes it an unfair labor practice for a labor union or its agents to induce or encourage a strike by neutral employees 'where an object thereof' is to force or require any neutral employer 'to cease doing business with any other person'. That section was enacted to outlaw secondary boycotts, and has been construed as proscribing secondary, concerted activity at the common premises of neutral employers and an employer with whom a union has a labor dispute,[6] though it does not prohibit a union from taking appropriate concerted action against a primary employer whose employees it represents for collective bargaining purposes.[7] As the Board recognized, the crucial problem in these cases, where both the primary and neutral employers occupy a common work site, is in distinguishing between 'permissible primary action and proscribed secondary action.' See N.L.R.B. v. Local Union No. 55, etc., 10 Cir., 218 F.2d 226, 231. In a commendable effort to balance 'the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own',[8] the Board, in its Moore Dry Dock Company case, supra, has devised certain evidentiary tests to aid in determining the ultimate issue of whether common-situs picketing is primary and lawful or secondary and unlawful.[9] Cf. Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, 741, 69 S.Ct. 1210, 93 L.Ed. 1659. And while four circuits have approved the criteria evolved by the Board in its Moore Dry Dock case, supra,[10] we think such approval was necessarily based upon substantial evidence that the unlawful objective denounced by the statute actually existed, rather than upon the inferentially suggested theory that this ultimate and controlling statutory inquiry may be effectually supplanted merely by Board findings that the real 'situs' of a labor dispute exists at a location other than that determined by the conduct of the parties, at which place alone it may be 'adequately' publicized with impunity under the Act, and thereby inferring from such findings, as here, that the unlawful objective exists.[11] Indeed, such a theory would, we think, elevate the Board formulated 'criteria' by judicial fiat to a vantage point from which it could, in effect, circumvent the statute, for in this type instance it would substitute Board inferences as to the lawfulness or unlawfulness of an objective, based purely on its own judgment as to the propriety and adequacy of the means employed in a labor dispute, for the sole statutory test of unlawfulness of the end or objective sought, contrary to the Supreme Court's pronouncements that it is "the objective of the unions' secondary activities * * * and not the quality of the means employed to accomplish that objective, which was the dominant factor motivating Congress in enacting that provision." International Brotherhood of Electrical Workers, Local 501, v. N.L.R.B., 341 U.S. 694, 704, 71 S.Ct. 954, 959, 95 L.Ed. 1299; N.L.R.B. v. International Rice Milling Co., supra, 341 U.S. at page 672, 71 S.Ct. at page 964. While our view does not compel rejection of all of the Moore Dry Dock criteria, as such, when properly applied, it does expressly limit the applicability of that decision as controlling under the facts of this case, for we conclude that no warrant exists either in the language of the statute or the authorities cited which would justify the adoption and approval of its 'situs' theory to an extent inconsistent with other provisions of the Act,[12] or for empowering the Board, under guise of fact-finding, to fix the 'situs' of a dispute at only one of a primary employer's numerous business activities,[13] thereby isolating other employees of that same primary employer from exercising their statutory right under Section 7, 29 U.S.C.A. § 157, to engage in mutual aid and protection and make common cause with their co-workers. See Carter Carburetor Corp. v. N.L.R.B., 8 Cir., 140 F.2d 714, 718; N.L.R.B. v. Peter Cailler Kohler Swiss Chocolates Co., 2 Cir., 130 F.2d 503, 505; N.L.R.B. v. J.I. Case Co., etc., 8 Cir., 198 F.2d 919, 922. Unless the truck drivers and warehousemen, only four in number, could persuade the other employees of Otis Massey to decline to do their employer's installation work until the strike was settled, it is obvious that the strike was foredoomed to failure from its inception, for picketing only at the warehouse 'situs' where such other employees almost never came was but a useless and futile gesture.
 
 
 8
 Irrespective of the Board formulated 'situs' theory, however, we think such peaceful picketing upon common premises, directed solely against the primary employer with whom a labor dispute exists, is still lawful under the Act, and that any adverse effect upon secondary, neutral employers must necessarily be viewed as incidental to the lawful exercise of that statutory right. N.L.R.B. v. International Rice Milling Co., supra; cf. N.L.R.B. v. Chauffeurs, Teamsters, etc., supra; N.L.R.B. v. Local Union No. 55, supra. That the picketing here enjoined was aimed only at the primary employer, Otis Massey, and wholly without the proscribed secondary object, could hardly be disputed under this record. It is significantly devoid of any probative proof in support of the allegations in the complaint[14] that respondent by 'picketing, * * * orders, instructions, directions, appeals and other means' induced and encouraged employees of the neutral employers to strike with unlawful secondary object, except for the peaceful picketing heretofore mentioned, and even under the Board's own evidence that concerted activity was solely for the lawful object of picketing only Otis Massey 'right at the sites of the dispute and as close to the actual operations of Otis Massey * * * as possible,' as evidenced by the letter and notice heretofore quoted, footnotes (2) and (3), supra. In fact, the Superintendent of the Texas Dental Clinic construction job, Louis Gamache, clearly showed his understanding from the Union business agent, Word, that the picketing was aimed solely at the Otis Massey craftsmen, as revealed by his testimony herewith quoted in the margin.[15] The work stoppages by the employees of neutral employers here complained of occurred only on January 27th and 29th, whereupon the union admittedly took the precaution of adding the 'See our pamphlet' notation to its picket signs, which pamphlet expressly limited the picketing to Massey, and after which only the Otis Massey employees honored the picket lines. Furthermore, it is practically without dispute that the pickets appeared after the men had begun work, and located themselves as close as possible to the place where the Otis Massey craftsmen were engaged in the normal business of that company. See Moore Dry Dock Co. case, supra. Under such circumstances, we conclude that the Board's order, based on the finding that such activity had an unlawful secondary object proscribed by the statute, is unenforceable as unsupported by substantial evidence on the record considered as a whole. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. While the drawing of appropriate inferences as to the unlawfulness of objective and motive in a labor dispute is primarily the province of the Board, there still must be some substantial basis for inferring a wrongful rather than a legitimate motive, which we think does not exist here. N.L.R.B. v. Houston Chronicle Pub. Co., 5 Cir., 211 F.2d 848, 854.
 
 
 9
 Enforcement denied.
 
 
 
 [1]
 The parties by stipulation, with Board approval, waived the right to a hearing before a trial examiner, and agreed for the Board to render its decision based upon certain stipulated facts, the pleadings, and the testimony and exhibits in an injunction proceeding which had previously been brought on February 8, 1954, by the Regional Director under Sec. 10(l) of the Act, 29 U.S.C.A. § 160(l), in the United States District Court at Houston, Texas. That proceeding resulted in an injunction barring respondent union from engaging in the picketing activities hereinafter described pending final determination by the Board of its legality. See Elliott v. General Drivers, etc., D.C., 123 F.Supp. 125, 130
 
 
 [2]
 Respondent union had previously requested permission from the general contractors at the hospital and dental clinic jobs to picket the premises nearest the location where the Otis Massey workers were stationed, but this permission was refused on the theory that the contractors did not own the property and were, therefore, in no position to grant the privilege. The union's letter requesting such permission at the dental clinic construction site (Respondent's Exhibit 1) reads as follows:
 'Gentlemen:
 'Otis Massey Company, Ltd., has been engaged in its normal business at the Texas Dental College job, for which you are general contractor, for some period of time and is presently engaged in doing some insulation work.
 'The area where Otis Massey Company Ltd. is now engaged in this work is within premises controlled by your company, and it is our desire to picket right at the sites of the dispute and as close to the actual operations of Otis Massey, Ltd. as possible.
 'As is clearly stated on our picket signs, the dispute is with Otis Massey Company, Ltd. and with no one else.
 'We, therefore, request that you permit our pickets to come within the premises generally controlled by you and picket directly adjacent to the place where Otis Massey Company, Ltd. employees are now working.
 'Yours truly, 'R. G. Miller, Secy-Treas. 'Local Union No. 968'
 
 
 [3]
 Specifically, this pamphlet or handbill (Respondent's Exhibit 2) reads as follows:
 'Notice
 'General Drivers Local Union 968, is on strike against Otis Massey Company, Ltd.
 'The Union asked permission to place pickets within these premises and adjacent to the place where Massey employees are now working, but we have not been permitted to do so. If we are permitted to do so, we will move these pickets and place them right at the actual operations of Otis Massey within these premises. In the meantime, please consider this picket line as if it were only around the limited area where Otis Massey is engaged in these premises.
 'Our dispute is with Otis Massey Company, Ltd. and not with any other employer working within this building site or area.'
 
 
 [4]
 The Board, in its cease and desist order, enjoined both the union and the individual respondent, its trustee M. W. Miller, from further unlawful secondary activity of the nature found
 
 
 [5]
 Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456
 
 
 [6]
 N.L.R.B. v. Denver Building & Const. Trades Council, 341 U.S. 675, 686, 71 S.Ct. 943, 95 L.Ed. 1284
 
 
 [7]
 N.L.R.B. v. International Rice Milling Co., Inc., 341 U.S. 665, 671, 71 S.Ct. 961, 95 L.Ed. 1277
 
 
 [8]
 N.L.R.B.- v. Denver Building & Const. Trades Council, supra, note 6, 341 U.S. at page 692, 71 S.Ct. at page 953
 
 
 [9]
 In that decision, the Board held that common-situs picketing, in order to qualify as primary and lawful, must meet all four of the following conditions:
 '(a) The picketing is strictly limited to times when the situs of dispute is located on the secondary employer's premises;
 '(b) at the time of the picketing the primary employer is engaged in its normal business at the situs;
 '(c) the picketing is limited to places reasonably close to the location of the situs; and
 '(d) the picketing discloses clearly that the dispute is with the primary employer.' 92 N.L.R.B. 547, 549.
 
 
 [10]
 N.L.R.B. v. Service Trade Chauffeurs, etc., 2 Cir., 191 F.2d 65, 68; Piezonki v. N.L.R.B., 4 Cir., 219 F.2d 879, 883; N.L.R.B. v. Chauffeurs, Teamsters, etc., 7 Cir., 212 F.2d 216, 219; N.L.R.B. v. Local Union No. 55, 10 Cir., 218 F.2d 226, 231
 
 
 [11]
 That this statement fairly summarizes the Board's position is evidenced by the following argument taken from its brief:
 'Since, as we have seen, the warehouse and not the construction projects was the situs of the dispute and since the Union could adequately publicize its dispute by picketing the warehouse, the Board properly inferred that at least one of the objects of the picketing at the projects was to force the various neutral contractors to cease doing business with Otis Massey by inducing or encouraging their employees to go on strike.' (Emphasis ours.)
 
 
 [12]
 A recently enacted Section 13 of the Act provides that:
 'Nothing in this (Act), except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right.' 29 U.S.C.A. § 163.
 Moreover, in its Rice Milling Co. case, supra, the Supreme Court construed Section 13 as follows:
 'By § 13, Congress has made it clear that § 8(b)(4), and all other parts of the Act which otherwise might be read so as to interfere with, impede or diminish the union's traditional right to strike, may be so read only if such interference, impediment or diminution is 'specifically provided for' in the Act. No such specific provision in § 8(b)(4) reaches the incident here. The material legislative history supports this view.' 341 U.S. 665, at page 673, 71 S.Ct. 961, at page 965.
 
 
 [13]
 If this factual issue be viewed as controlling, it should be noted that one of the Otis Massey business partners, J. V. Castle, conceded in his testimony that 'probably seventy per cent or better' of the Company's business activities consisted of 'job site work', rather than warehouse operations, and the record shows that the truck driver-warehousemen, during the period here material, did make a number of deliveries to the Otis Massey job sites, as evidenced by the Government's concession as follows:
 'The Court: You are simply trying to prove from time to time during the course of this work these truck drivers and warehousemen make deliveries out there for the Massey Company? I am sure the Government doesn't dispute that.
 'Mr. Henderson: No, sir. We will certainly concede that.'
 
 
 [14]
 Of some further significance is the fact that this complaint was brought at the instance of the primary employer and charging party, Otis Massey, rather than on behalf of any adversely affected secondary, and neutral employers
 
 
 [15]
 'Q. What was your conversation with Mr. Word? How did it start? A. I went over and asked Mr. Word if the men would be involved on account of the picket line. He said no, it was strictly against Otis Massey and wouldn't involve the men
 'Q. When you say 'the men', what do you mean? A. All workmen on the job.
 'Q. Did you ask him anything else? A. I said if the insulators went home and quit the job, would he quit picketing the job, and he said he would.'