RETAIL FRUIT & VEGETABLE CLERKS UNION, LOCAL 1017, and Retail Grocery Clerks Union, Local 648, RETAIL CLERKS INTERNATIONAL ASSOCIATION, AFL–CIO, Petitioners, Respondents,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent, Petitioner.

No. 15298.

United States Court of Appeals Ninth Circuit.

Nov. 8, 1957.

Carroll, Davis, & Burdick, San Francisco, Cal., for petitioner.

Jerome D. Fenton, Gen. Counsel, Stephen Leonard, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Duane Beeson, Norton J. Come, Attys., N.L.R.B., Washington, D. C., for respondent.

Before DENMAN, Senior Circuit Judge, and BONE and FEE, Circuit Judges.

BONE, Circuit Judge.

Petitioners bring the instant proceeding to this Court for review and seek an order setting aside an order of the National Labor Relations Board (herein "Board") issued against petitioners on August 24, 1956. Board in its answer requested enforcement of its order.

This case arose when negotiations between Retail Grocery Clerks Union, Local 648 (herein "Local 648"), and the Retail Grocers Association of San Francisco[1] (herein "Association") resulted in a failure of the parties to agree on a collective bargaining agreement. On or about February 3, 1955, Local 648 picketed two stores operated by members of Association, and Association members responded by a "lockout" on the theory that a "strike" against one is a strike against all members of Association.

Association bargained for the member firm of J. M. Long and Co., Inc. (herein "Long"). Long owned and operated a property called the Crystal Palace Market (herein "Market") in San Francisco. Long not only owned and managed the Market building as a whole, but directly operated several departments therein: a grocery, an appliance store, a sport shop, a housewares department, two liquor, tobacco and magazine departments, a grocery warehouse, a carpenter shop, general offices and a large parking area for customers of the Market. The remainder of the sixty-four departments operating in the Market at the time of the "strike-lockout" were owned and operated by other individuals under so-called "minimum and percentage" lease arrangements by which the lessee operators of these separate departments paid to Long each month a fixed sum plus a percentage of gross sales. These agreements ran from month to month and were subject to cancellation by either party on thirty days' notice.

In addition to the grocery department directly owned and operated by Long, there were in the Market approximately six grocery and delicatessen departments which employed members of, and bargained with, Local 648. Some, though not all, of these operators were repre-

---

[1] Grocers Association is a trade association whose membership is comprised of about 500 retail grocers in the San Francisco area. Grocers Association is the bargaining agent for its members in collective bargaining agreements with Local 648. It also bargains for non-members who have given it powers of attorney. The trial examiner found that during 1954, members of Grocers Association and others for whom it bargains, purchased groceries and other products valued in excess of $25,000,000, of which amount products valued in excess of $5,000,000 were received indirectly in the flow of commerce from points outside the State of California. The trial examiner concluded that the operations of Grocers Association affected commerce within the meaning of the National Labor Relations Act.

sented by Association. Following the "strike and lockout", the grocery department operated by Long was closed. The Standard Groceteria, a lessee in the Market employing Local 648 members, was also closed. The other grocery and delicatessen members opened and closed intermittently. All other departments in the Market (including those operated directly by Long) were open for business and operated throughout the period of the so-called strike and lockout.

Pickets were placed at seven of the eleven entrances [2] to Market on February 15, 1955. The pickets indicated by placards, etc., that the dispute was between Local 648 and both Long and Standard Groceteria. Peaceful picketing continued until February 24. During this entire period, Long continued all of its operations in the Market, save and except its grocery. Also during this period other employees, members of other unions, crossed the picket lines to do their regular work in the Market, but some employees, including members of Retail Fruit and Vegetable Clerks Union, Local 1017 (herein "Local 1017") refused to cross the picket lines. At this time Local 1017 had contracts with about five *fruit and vegetable departments* in the Market building, which departments were represented for collective bargaining purposes by the Retail Fruit Dealers Association of San Francisco [3] (herein "Fruit Dealers Association"). The collective bargaining agreement between Local 1017 and Fruit Dealers Association was in operation at this time and there was no dispute between the parties thereto.

Fruit Dealers Association filed unfair labor charges with the National Labor Relations Board on February 16, 1955 and a complaint was issued. Petitioners answered, denying the charges and moved to dismiss the complaint. Hearings were held whereupon the Trial Examiner issued his intermediate report and recommended order, finding petitioners to have violated § 8(b)(4)(A) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 158(b)(4)(A). Petitioners filed written exceptions to the Trial Examiner's report. The Board, one member concurring especially and two members dissenting, issued a decision and order affirming the Trial Examiner. See Retail Fruit & Vegetable Clerks' Union, Local 1017, and Retail Grocery Clerks' Union, Local 648, Retail Clerks International Association, AFL-CIO [Crystal Palace Market] and Retail Fruit Dealers' Association of San Francisco, Inc., 116 N.L.R.B. 856 (1956). The intermediate report and recommended order of the Trial Examiner begins at 116 N.L.R.B. 876. The Trial Examiner's report also included a helpful diagram of the Market, with entrances marked and the stands operated by Long being marked.

Section 8(b)(4)(A) of the Act is not an example of the clearest type of statutory draftsmanship. It has given the Board and courts considerable difficulty. The division of the Board into a 2-1-2 decision in this case is indicative of the many uncertainties involved. The statute reads:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

\* \* \* \* \*

"(4) to engage in, or to induce or encourage the employees of any em-

---

**2.** "The only entrances not picketed were the four in the rear of the market which face the free parking area. Picketing of those entrances would have required the pickets to parade on private property and this was at no time attempted." Intermediate Report and Recommended Order of the Trial Examiner, 116 N.L.R.B. 856, at p. 881. The Trial Examiner found that mass picketing of the entrances to the parking area was abandoned during the first day of the picketing and not resumed again.

**3.** Fruit Dealers Association is a trade association made up of about 150 to 160 employers who operate retail fruit and produce stands in the City of San Francisco. This association engages in multi-employer collective bargaining in behalf of its members with Local 1017.

ployer to engage in, a strike or a concerted refusal in the course of their employment * * * to perform any services, where an object thereof is: (A) forcing or requiring * * * any employer or other person * * * to cease doing business with any other person; * * *."

As we understand this statute there are two necessary requirements to find a violation of it. These are: (1) Independent *neutral employers* (see National Labor Relations Board v. Business Machine and Office Appliance Mechanics Conference Board, Local 459, 2 Cir., 1955, 228 F.2d 553, 557, for a situation where the *secondary employers* were found to be "allied" with the *primary employer*), and (2) the union must have as an object of its picketing (or other activity) the inducement or encouragement of the *neutral employees* to engage in a concerted refusal to work for their *neutral employer*, so that the neutral employer will cease doing business with the *primary employer*, which indicates that the neutral employer must be doing some sort of business with the primary employer.

▆▆ The first question for consideration is whether or not the lessees operating retail stands in the Market were independent neutral (or secondary) employers and thus within the protection of § 8(b)(4)(A). It is petitioners' contention that the lessees were under direct and strong control of Long.[4] The Board believes that the factors from which petitioners infer control by Long over the lessees were the arrangements designed to protect Long's interest as lessor, and emphasizes that each of the lessees provided its own working capital, managed its own business in all respects not limited in the lease agreement, and each controlled its own employment relations. The Board found the lessees were neutral employers[5] entitled to the protection of § 8(b)(4)(A).

The question here presented is somewhat like the question decided in National Labor Relations Board v. Hearst Publications, Inc., 1944, 322 U.S. 111, 130–132, 64 S.Ct. 851, 88 L.Ed. 1170, where the Court ruled that determination by the Board that, in the circumstances of the case, a person is an employee under the National Labor Relations Act, may not be set aside on review if it has warrant in the record and a reasonable basis in law. We believe the finding by the Board that the lessees of Long were independent and *neutral employers* is supported by substantial evidence and has a reasonable basis in law. Though Long had some control over certain aspects of the lessees' business operations, this does not necessarily preclude the lessees from being independent neutral em-

4. This contention is not unreasonable when the evidence is examined. Long had a manager in charge of the general conduct of the Market. The lessees paid a fixed monthly fee for the space used and in addition a percentage of their gross sales. Representatives of Long could enter the area leased by these retail operators to see that the operations were "being properly conducted," that they were "being conducted in an orderly and clean fashion." Long representatives may audit the books and bank statements of these retail operators. Long employed an advertising manager who manages all advertising for the Market as a whole, including that of the retail operators. Long had a carpentry shop that repaired all fixtures for its own operations as well as for the lessees. Long's manager for the Market, Mr. Sidney Haag, testified that he told the grocery stand operators employing members of Local 648 " * * that under no consideration would I permit them to open their places on Monday morning, in order to effect a safeguard against picketing," that these lessees responded "that my demands were clear enough and that they would not open." Mr. Haag testified, "Obviously, if they signed [an agreement with Local 648], they could remain open * * *." Apparently three did sign with Local 648 and did remain open during the strike and lockout.

5. The Board, in its brief, concedes that this finding does not pertain to those tenants who, like Long, were parties to the dispute through their membership in the Grocers Association and their bargaining relation with Local 648.

ployers. See National Labor Relations Board v. Denver Building & Construction Trades Council, 1951, 341 U.S. 675, 689–690, 71 S.Ct. 943, 95 L.Ed. 1284.

█ The second assertion of error by petitioners is that even if the lessees be considered independent neutral employers, there can be no violation of § 8(b)(4)(A) since is was *not an object* of union conduct to prevent the lessees from doing business with Long. It is petitioners' argument that a normal landlord-tenant relationship (which Board says is involved here) is not what Congress intended to include in the term "doing business." Petitioners further assert that the only way the lessees could "cease doing business" with Long would have been to terminate their lease and move out, and that there is no evidence that such a result was "an object" of the picketing.

Board asserts that lease termination is not the only manner in which the parties could "cease doing business," but claims that the handling of the advertising for all lessees in the Market and the agreement in the leases whereby Long received a percentage of the tenants' receipts over a fixed minimum would both be disrupted if the lessees' operations were closed down as a result of the picket line. Board says that such partial disruptions in the relations between the lessees and Long are included in the phrase "cease doing business" as used in § 8(b)(4)(A).

Board also argues that the finding of a violation in this case does not rest alone on the claimed disruption of lessees' business with Long, but is also found in disruption of business between the lessees and their suppliers.[6] It is Board's position that as the statute enjoins *the object* of cessation of business between a neutral employer and "any other person," it includes business dealings involving such suppliers as well as those involving the primary employer.

There is reasonable basis in fact and in law for finding that the lessees were "doing business" with Long. National Labor Relations Board v. Hearst Publications, Inc., supra. " * * * The phrase, 'doing business,' would ordinarily cover doing any business which the third party is free to discontinue, * * * The phrase, 'cease doing business,' is general * * *." International Brotherhood of Electrical Workers, Local 501 v. National Labor Relations Board, 2 Cir., 1950, 181 F.2d 34, 37.

Petitioners' third issue concerns evidence introduced before the Trial Examiner from which the Trial Examiner and the Board found and concluded that petitioners sought to induce and encourage neutral employees to engage in concerted activity in violation of § 8(b)(4)(A). The Board viewed this case as one involving a "common situs," that is, one where both primary and neutral employers did business on the same or a common situs. The Board has developed a set of principles to aid it in analyzing the picketing in such cases. These principles received their most comprehensive statement in Sailors Union of the Pacific (Moore Dry Dock Co.), 92 N.L.R.B. 547, 549, which case involved picketing of the neutral employer's place of business. Petitioners contend that the rule of the Moore Dry Dock case does not apply as that case involved picketing *the premises of the secondary employer* whereas in the present case the picketing was at *the*

6. Officials of Local 1017 warned some operators of fruit and vegetable stands before the beginning of picketing to "buy light" to protect themselves, or, so Board contends, to reduce the amount of their business with the suppliers. Petitioners say this was only a *friendly suggestion* to the operators not to overstock since some people might refuse to cross the picket lines, and was not intended to induce the operators to "cease doing business" with their supplier.

The Board may draw reasonable inferences from proven facts. Radio Officers' Union of Commercial Telegraphers Union, A.F.L. v. National Labor Relations Board, 347 U.S. 17, 48–52, 74 S.Ct. 323, 98 L.Ed. 455; National Labor Relations Board v. Kaiser Aluminum & Chemical Corp., 9 Cir., 1954, 217 F.2d 366, 368.

*premises of the primary employer.* The petitioners add, however, that even if the rule of the Moore Dry Dock case is applied in this case, the picketing met all the requirements delineated in the Moore Dry Dock Case.[7]

█ The Board, in its opinion, 116 N.L.R.B. 856, 859, decided that the principles of the Moore Dry Dock case should apply to common situs picketing for the reason that the impact on neutrals is the same whether the primary employer owns the premises or whether the secondary employer does. We believe this entirely reasonable as the prohibition of § 8(b) (4) (A) is directed toward objectives of concerted activity, and not the mere location of union activities.

Petitioners believe that the decisions by the Board in Oil Workers Union, Local 346 (Pure Oil Company) 84 N.L.R.B. 315, 318–320 (1949), and United Electrical Radio and Machine Workers of America, Local 813, C.I.O. (Ryan Construction Corporation), 85 N.L.R.B. 417 (1949), are in point and support the picketing. It would seem that the majority of the Board also found the Ryan case apposite to the present facts, for the opinion of the Board in the present case, 116 N.L.R.B. 856, 859–860, indicates that it is overruling its opinion in Ryan, despite the fact that the Supreme Court of the United States has expressed approval of the Board's Ryan decision by citing it in National Labor Relations Board v. International Rice Milling Co., 1951, 341 U.S. 665, 672, footnote 6, 71 S.Ct. 961, 95 L.Ed. 1277. To make the status of the Ryan case more confusing, the member of the Board who wrote an opinion concurring with the majority of two cited the Ryan decision as authority and explicitly stated it apparently was cited with approval by the Supreme Court in the Rice Milling case, supra. Thus, we have two members of the Board apparently overruling the Ryan decision and three members of the Board approving it. We are in doubt whether the Ryan decision is overruled or not. Since but two out of three Board members approved of overruling the Ryan decision, we believe it is not overruled.[8]

█ The majority of the Board viewed the problem to be whether petitioners had limited the impact of picketing on neutrals. The application of the principles of the Moore Dry Dock case cannot be a substitute for evidence. Rather, these principles are " * * * evidentiary tests to aid in determining the ultimate issue of whether common-

---

7. The Board stated, in the Moore Dry Dock case, 92 N.L.R.B. 547, 549: " * * we believe that picketing the premises of a secondary employer *is primary* if it meets the following conditions: (a) The picketing is strictly limited to the times when the situs of the dispute is located on the secondary employer's premises; (b) *at the time of the picketing* the primary employer is engaged in its normal business at the situs; (c) the picketing is limited to places reasonably close to the location of the situs; and (d) the picketing discloses clearly that the dispute is with the primary employer." (Emphasis supplied.)

8. In any event, we believe the facts of this case are sufficiently different so that the Board could have applied the principles of Moore Dry Dock without overruling Ryan. In the Ryan case, the Ryan Construction Co. was the only neutral employer involved. Here, we have about 60 neutral employers operating in the market. In the Ryan case, Ryan was constructing additions to the plant of the primary employer, and when that one construction job was finished, Ryan would have no more business on *the primary premises* unless a new construction contract was made. Here, the lessee employers were doing their total business on the premises of the primary employer and presumably would continue to do so for an indefinite period of time. In the Ryan case, *the employees of Ryan were business invitees on the primary premises.* But here, the secondary employers were lessees and might legitimately claim greater rights of access to their business departments for themselves, their employees and for their potential customers. The same distinctions appear to exist in General Teamsters, Chauffeurs and Helpers, Local Union No. 249, etc., and Crump, Incorporated, 112 N.L.R.B. 311 (1955), which the Board also sought to overrule in this case.

situs picketing is primary and lawful or secondary and unlawful * * *." National Labor Relations Board v. General Drivers, Warehousemen and Helpers, Local 968, 5 Cir., 1955, 225 F.2d 205, 209, certiorari denied, 1955, 350 U.S. 914, 76 S.Ct. 198, 100 L.Ed. 801. As the Supreme Court pointed out in National Labor Relations Board v. International Rice Milling Co., Inc., 1951, 341 U.S. 665, 672, 71 S.Ct. 961, 965; "* * * It is the object of union encouragement that is proscribed by that section, rather than the means adopted to make it felt." (Footnote by the Court omitted.)

 Does the evidence show that the petitioners sought an objective made unlawful by § 8(b)(4)(A)? Section 8 (b)(4)(A) makes it unlawful for a union to bring economic pressure against the primary employer, with whom the union has a dispute, by the indirect device of inducing or encouraging *employees of neutral employers* to engage in a strike *or* concerted refusal to do certain work in the course of *their employment,* so that neutral employers will have to cease business relations with primary employers, thereby placing greater economic pressure on primary employers. "* * * Was there substantial evidence on the whole record to support the Board's finding that the Union's acts constituted an unfair labor practice under this section?" National Labor Relations Board v. Business Machine and Office Appliance Mechanics Conference Board, Local 459, 2 Cir., 1955, 228 F.2d 553, 557.

We will summarize the evidence which the Board found to be significant. The Board grouped the evidence into three categories.

We first consider the Board's third reason for finding a violation of § 8(b) (4)(A) as we deem it the most significant. The Trial Examiner found it to be the official policy of Local 1017 for its members to support any picket line of Local 648. The evidence shows that the secretary-treasurer of Local 1017 participated in the meeting between Local 648 and Long which resulted in the picketing of Market. Also, the secretary-treasurer participated in the picket line for a short time, expressed approval of the picket line in the presence of employees of neutral employers and members of Local 1017, and did not at any time inform members of Local 1017 that concerted refusal to cross the picket line might involve the union in a violation of § 8(b)(4)(A). Participation by an official of Local 1017 in a picket line established by Local 648 does not indicate neutrality on the part of Local 1017. We believe that Local 1017 is responsible for the conduct of its secretary-treasurer, who, as Local 1017's agent, encouraged employees of neutral employers to engage in *concerted conduct prohibited* by § 8(b)(4)(A).

The Board also found that Pat Savin, business agent of Local 1017, enforced this policy of Local 1017 to support the picket line of Local 648. The Trial Examiner found, on substantial evidence, that Savin induced two employees who reported to a neutral employer for work on the first day of the picketing to quit work during the picketing. The Trial Examiner found that Savin ordered both men to leave the Market,[9] and both complied. One did not return until the last day of the picketing, and then only after obtaining the permission of Savin.

9. It is petitioners' contention, as we understand it, that these incidents "* * * seems to have involved the employment of a non-union member or other violation of provisions of the collective bargaining agreement currently in effect between Local 1017 and the fruit and vegetable stand operators in the Crystal Palace Market." Another incident involved the manager of a stand who was told by the Union official he should not be there, according to the operator; the union official gave a different view of the incident. What happened in fact, and reasonable inferences based thereon, is for the Board to determine, and if supported by substantial evidence on the whole record, will be affirmed by this Court.

The Trial Examiner and the Board concluded that Local 1017 was responsible for the conduct of its business agent, and that Savin's conduct violated § 8(b)(4)(A) in that his conduct was an inducement of employees of a neutral employer to engage in a concerted refusal to work with the object of such refusal being the disruption of dealings between a neutral employer and the primary employer. The Trial Examiner and the Board also concluded that as Savin was "temporarily assigned" to aid Local 648 in obtaining signed contracts, Local 648 was responsible for the conduct of Savin as he was subject to control by Local 648.

The evidence supports the conclusion of the Board that Savin was acting with approval of *both locals*. We believe the Trial Examiner and the Board correctly determined that both Locals were responsible for his conduct. We believe the record as a whole substantially supports the determination by Board that an *object* of Local 648 and Local 1017 was to involve neutrals and their employees in the primary dispute between Local 648 and Long (represented in bargaining by Association) and to disrupt business relations between neutral employers and the primary employer. Such object on the part of petitioners was an unfair labor practice within § 8(b)(4)(A) of the National Labor Relations Act as amended, 29 U.S.C.A. § 158(b)(4)(A).

The other evidence from which the Board found a violation of § 8(b)(4)(A) concerned the picketing of the Market by Local 648.

The first evidentiary factor discussed by the Board is found in the offer of Mr. Haag, manager of the Market for Long, to allow the pickets of Local 648 to picket before the particular stands of Long's grocery department and Standard Groceteria which were involved in the dispute, rather than to picket the entrances to Market. A representative of Local 648 refused to picket *inside* as such picketing would not give Local 648 *the desired economic pressure*. Board infers

from this offer and from this non-acceptance, that Mr. Haag made the offer to minimize the impact of the picketing on neutral lessees in Market, and that in refusing, Local 648 showed that it did not wish to *limit* the impact of the picketing to Long, but sought to extend the picketing to encourage or induce concerted action by neutral employees. While Local 648 contends the aisles were too narrow to permit adequate picketing inside Market, the Trial Examiner and Board found to the contrary.

The second factor Board emphasizes to support its claim that Local 648 did not minimize the impact of its picketing is found in the placement of the pickets. Local 648 placed pickets *at all three entrances opening on Market Street*. Two of these Market Street entrances were adjacent to non-grocery departments directly operated by Long and open at all times. But the entrance marked "3" (see exhibit printed in the Trial Examiner's report, 116 N.L.R.B. 856, at p. 876) was also picketed, and it was not in the immediate vicinity of any department operated by Long. Board contends that picketing an entrance not immediately adjacent to any Long operated department can only be explained on the ground that Local 648 sought to reach employees of neutral employers who were located along the aisle directly served by that entrance. The Board reaches this conclusion despite the fact that a person who enters at any of the entrances has access to all Market operations.

When this evidence is considered in connection with the previously discussed evidence concerning the conduct of officials of Local 1017, and the responsibility which Local 648 shares in that conduct, we believe the Board could properly infer that an object of the picketing was to involve neutrals in the dispute, which is a violation of § 8(b)(4)(A).

We are not unmindful of the fact that Long, the primary employer against whom Local 648 was picketing, owned the entire Market building, and we are aware of the merit in Local 648's contention that as Long owned the Market

building the *situs* of the dispute was Market, and not merely the departments inside Market which were directly operated by Long. Nor do we forget that some courts have ruled that where picketing is properly limited to the primary employer, any injury to neutrals that share the situs of the primary employer is "incidental," and not within the proscription of § 8(b)(4)(A). E. g. National Labor Relations Board v. General Drivers, Warehousemen and Helpers, Local 968, 5 Cir., 1955, 225 F.2d 205, 210, certiorari denied 350 U.S. 914 (1955).

The Supreme Court said in National Labor Relations Board v. International Rice Milling Co., Inc., 1951, 341 U.S. 665, 672, 71 S.Ct. 961, 965, "That Congress did not seek, by § 8(b)(4), to interfere with ordinary strike * * *." But we believe the strike in this case was not an "ordinary one." Here, in addition to the primary employer owning the premises where it does business, there are neutral employers leasing space from the primary employer; there are not one, two or three neutral employers involved here, but between two and three score, and their businesses would have been materially affected by the pickets at the entrance to the Market;[10] this is not the case where building construction trades-

men enter onto a common situs to do one type of job after which there will be no more work to be done on the premises, as in Ryan Construction Co., supra, Crump, Inc., 112 N.L.R.B. 311 (1955), and National Labor Relations Board v. General Drivers, Warehousemen and Helpers, Local 968, supra. Here, the entire business operations of the many neutral employers were being conducted on premises owned by Long, the primary employer, and will probably continue to operate thereon so long as business conditions justify. This unique situation (not duplicated in any case called to our attention) may well account for the differences of opinion among Board members as to principles properly applicable to the facts of this case.

Each case must be considered " * * in the light of its surrounding circumstances * * *." National Labor Relations Board v. International Rice Milling Co., Inc., supra. In the circumstances of this case,[11] we believe a union must exercise its right to picket with restraint consistent with the right of neutral employers to remain uninvolved in the dispute. The Board found that petitioners did not conduct the picketing so as not to involve neutral employers in the dispute,[12] but actively encouraged con-

---

10. It may reasonably be inferred that the picketing did affect business of the neutral employers from the conduct of one of those neutral employers. " * * * The picketing met with the displeasure of one Rose Misuraca, who operated a fruit and produce stand in the Market within the jurisdiction of Local 1017. She became concerned over the fact that the picketing would affect her stand, despite the fact that she and the other fruit dealers in the Market were not involved in any labor dispute. She prepared a sign reading as follows: 'Im Not Unfair To Any One I Have 4 Kids The Union Wont Feed Them. Fruits & Veg Are Not On Strike Dept 54.'" 116 N.L.R.B. 856, at page 882.

11. "It may be that the Pure Oil and the Schultz cases establish the rule that whenever picketing is confined to the immediate business of the primary employer it is lawful primary action protected by Section 13 and therefore not within the secondary boycott ban * *.

"Another possibility is that the Board did not want to establish a doctrine that any picketing of the immediate employer's premises is lawful, because they felt there would be situations where the picketing was actually confined to the employer's premises, but was nevertheless violative of the intent and purpose of Section 8(b) (4) (A). Such a situation could readily arise, for example, where the primary and secondary employers' businesses were both located on the same premises." See "Picketing Under Section 8(b) (4) (A) of the Taft-Hartley Act," 45 Ill.L.Rev. 408, 414 (1950).

12. Restriction of picketing to a narrow area may not be sufficient in itself, " * * The limitation of the complaint to an incident in the geographically restricted area near the mill is significant, although not necessarily conclusive * * *." National Labor Relations Board v. International Rice Milling Co., Inc., 1951, 341 U.S. 665, 671, 71 S.Ct. 961, 964.

**600**

certed activity by employees of neutral employers for *an object* proscribed by § 8(b)(4)(A).

Petitioners assert that if the Board's order is enforced, employers will find it to their advantage to lease out a part or parts of their premises to other employers so that the union striking the primary employer will be required to sharply limit the extent of its picketing. If this should happen we are certain that Congress, the Board, and the courts will take cognizance of it, and effectuate an appropriate remedy if the fact situation justifies such action. We do not face such a situation here. Also, it should be noted that § 8(b)(4)(A) does not, per se, prohibit picketing of a common situs. The Supreme Court noted in National Labor Relations Board v. International Rice Milling Co., Inc., supra, that " * * the applicable proscriptions of § 8(b)(4) are expressly limited to the inducement or encouragement of *concerted* conduct by the employees of the neutral employer. * * * " It would seem from this that there would be no unfair labor practice *unless* substantial evidence on the whole record shows that the union encouraged (by picketing or other action) "concerted conduct" by employees of a neutral employer against their own employer where an objective sought by such concerted conduct is one proscribed by § 8(b)(4)(A).

It is the duty of the Board to balance " * * * the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." National Labor Relations Board v. Denver Building & Construction Trades Council, 1951, 341 U.S. 675, 692, 71 S.Ct. 943, 953. We believe the Board has done so in this case.

Petitioners' request to set aside the order of the Board is denied. The petition of the Board for enforcement of its order is granted.