NATIONAL LABOR RELATIONS BOARD *v.* IN-
TERNATIONAL RICE MILLING CO., INC. ET AL.

No. 313.  Argued February 27, 1951.—Decided June 4, 1951.

*David P. Findling* argued the cause for petitioner. With him on the brief were *Solicitor General Perlman, Mozart G. Ratner* and *Bernard Dunau.*

*Conrad Meyer, III* argued the cause and filed a brief for respondents.

*Herman Phleger, Gregory A. Harrison* and *Marion B. Plant* filed a brief for the Di Giorgio Fruit Corporation, as *amicus curiae,* urging affirmance.

MR. JUSTICE BURTON delivered the opinion of the Court.

The question presented is whether a union violated § 8 (b) (4) of the National Labor Relations Act, 49 Stat. 449, 29 U. S. C. § 151, as amended by the Labor Management Relations Act, 1947,[1] under the following circum-

---

[1] "SEC. 8. . . .

"(b) It shall be an unfair labor practice for a labor organization or its agents—

.      .      .      .      .

"(4) to engage in, or *to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment* to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or *to perform any services, where an object thereof is:* (A) *forcing or requiring* any employer or self-employed person to join any labor or employer organization or *any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person;* (B) *forcing or requiring any other employer to recognize or bargain*

stances: Although not certified or recognized as the representative of the employees of a certain mill engaged in interstate commerce, the agents of the union picketed the mill with the object of securing recognition of the union as the collective bargaining representative of the mill employees. In the course of their picketing, the agents sought to influence, or in the language of the statute they "encouraged," two men in charge of a truck of a neutral customer of the mill to refuse, in the course of their employment, to go to the mill for an order of goods. For the reasons hereinafter stated, we hold that such conduct did not violate § 8 (b) (4).

This case was heard here with No. 393, *Labor Board* v. *Denver Building Trades Council, post,* p. 675; No. 108,

---

*with a labor organization as the representative of his employees* unless such labor organization has been certified as the representative of such employees under the provisions of section 9; (C) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 9; (D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work: *Provided,* That nothing contained in this subsection (b) shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of *such employees whom such employer is required to recognize under* this Act; . . . ." (Emphasis supplied.) 61 Stat. 140–142, 29 U. S. C. (Supp. III) § 158 (b) (4).

The above provisions, together with those of § 303, 61 Stat. 158, 29 U. S. C. (Supp. III) § 187, have been referred to by Congress and the courts as the "secondary boycott sections" of the Act.

*International Brotherhood of Electrical Workers* v. *Labor Board, post,* p. 694; and No. 85, *Local 74, United Brotherhood of Carpenters* v. *Labor Board, post,* p. 707. Its facts, however, distinguish it from those cases.

This review is confined to the single incident described in the complaint issued by the Acting Regional Director of the National Labor Relations Board against the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 201, A. F. L., herein called the union. The complaint originally was based upon four charges made against the union by several rice mills engaged in interstate commerce near the center of the Louisiana rice industry. The mills included the International Rice Milling Company, Inc., which gives its name to this proceeding, and the Kaplan Rice Mills, Inc., a Louisiana corporation, which operated the mill at Kaplan, Louisiana, where the incident now before us occurred. The complaint charged that the union or its agents, by their conduct toward two employees of a neutral customer of the Kaplan Rice Mills, engaged in an unfair labor practice contrary to § 8 (b) (4). The Board, with one member not participating, adopted the findings and conclusions of its trial examiner as to the facts but disagreed with his recommendation that those facts constituted a violation of § 8 (b) (4) (A) or (B). The Board dismissed the complaint but attached the trial examiner's intermediate report to its decision. 84 N. L. R. B. 360. The Court of Appeals set aside the dismissal and remanded the case for further proceedings. 183 F. 2d 21. We granted certiorari because of the importance of the principle involved and because of the conflicting views of several circuits as to the meaning of § 8 (b) (4). 340 U. S. 902.[2]

_____

[2] While the complaint charged no unfair labor practice on the part of the union in its relations with employees of the Kaplan Mill,

The findings adopted by the Board show that the incident before us occurred at the union's picket line near the Kaplan Mill in October, 1947. The pickets generally carried signs, one being "This job is unfair to" the union. The goal of the pickets was recognition of the union as the collective bargaining representative of the mill employees, but none of those employees took part in the picketing. Late one afternoon two employees of The Sales and Service House, which was a customer of the mill, came in a truck to the Kaplan Mill to obtain rice or bran for their employer. The union had no grievance against the customer and the latter was a neutral in the dispute between the union and the mill. The pickets formed a line across the road and walked toward the truck. When the truck stopped, the pickets told its occupants there was a strike on and that the truck would have to go back. Those on the truck agreed, went back to the highway and stopped. There one got out and went to the mill across the street. At that time a vice president of the Kaplan Mill came out and asked whether the truck was on its way to the mill and whether its occupants wanted to get the order they came for. The man on the truck explained that he was not the driver and that he would have to see the driver. On the driver's return, the truck proceeded,

---

it did charge that the union also violated § 8 (b) (4) (A) by its conduct in inducing and encouraging employees of two neutral railroads to engage in a concerted refusal, in the course of their employment, to transport or otherwise handle articles shipped to or from some of the respective mills, including the Kaplan Mill. Not only did the encouragement of concerted action which was alleged in that charge differ substantially from the conduct which is before us but the Board found that the railroad employees were not employees within the meaning of § 8 (b) (4). 84 N. L. R. B. 360. The Court of Appeals held to the contrary and remanded the charge for further proceedings. 183 F. 2d 21, 24–26. The Board, however, does not seek a review of that order.

with the vice president, to the mill by a short detour. The pickets ran toward the truck and threw stones at it. The truck entered the mill, but the findings do not disclose whether the articles sought there were obtained. The Board adopted the finding that "the stopping of the Sales House truck drivers and the use of force in connection with the stoppage were within the 'scope of the employment' of the pickets as agents of the respondent [union] and that such activities are attributable to the respondent." 84 N. L. R. B. 360, 372.

The most that can be concluded from the foregoing, to establish a violation of § 8 (b) (4), is that the union, in the course of picketing the Kaplan Mill, did encourage two employees of a neutral customer to turn back from an intended trip to the mill and thus to refuse, in the course of their employment, to transport articles or perform certain services for their employer. We may assume, without the necessity of adopting the Board's findings to that effect, that the objects of such conduct on the part of the union and its agents were (1) to force Kaplan's customer to cease handling, transporting or otherwise dealing in products of the mill or to cease doing business with Kaplan, at that time and place, and (2) to add to the pressure on Kaplan to recognize the union as the bargaining representative of the mill employees.

A sufficient answer to this claimed violation of the section is that the union's picketing and its encouragement of the men on the truck did not amount to such an inducement or encouragement to "concerted" activity as the section proscribes. While each case must be considered in the light of its surrounding circumstances, yet the applicable proscriptions of § 8 (b) (4) are expressly limited to the inducement or encouragement of *concerted*

conduct by the employees of the neutral employer.[3]  That language contemplates inducement or encouragement to some concert of action greater than is evidenced by the pickets' request to a driver of a single truck to discontinue a pending trip to a picketed mill.  There was no attempt by the union to induce any action by the employees of the neutral customer which would be more widespread than that already described.  There were no inducements or encouragements applied elsewhere than on the picket line.  The limitation of the complaint to an incident in the geographically restricted area near the mill is significant, although not necessarily conclusive. The picketing was directed at the Kaplan employees and at their employer in a manner traditional in labor disputes.  Clearly, that, in itself, was not proscribed by § 8 (b) (4).  Insofar as the union's efforts were directed beyond that and toward the employees of anyone other than Kaplan, there is no suggestion that the union sought *concerted* conduct by such other employees.  Such efforts also fall short of the proscriptions in § 8 (b) (4).  In this case, therefore, we need not determine the specific objects toward which a union's encouragement of concerted conduct must be directed in order to amount to an unfair labor practice under subsection (A) or (B) of § 8 (b) (4). A union's inducements or encouragements reaching individual employees of neutral employers only as they happen to approach the picketed place of business generally are not aimed at concerted, as distinguished from individual, conduct by such employees.  Generally, therefore, such actions do not come within the proscription of § 8 (b) (4), and they do not here.

---

[3] It is not charged here that the union or its agents themselves engaged in a strike or concerted activity for an object proscribed by § 8 (b) (4).

672

In the instant case the violence on the picket line is not material. The complaint was not based upon that violence, as such. To reach it, the complaint more properly would have relied upon § 8 (b) (1) (A) [4] or would have addressed itself to local authorities. The substitution of violent coercion in place of peaceful persuasion would not in itself bring the complained-of conduct into conflict with § 8 (b) (4). It is the object of union encouragement that is proscribed by that section, rather than the means adopted to make it felt.[5]

That Congress did not seek, by § 8 (b) (4), to interfere with the ordinary strike has been indicated recently by this Court.[6] This is emphasized in § 13 as follows:

[4] "SEC. 8. . . .

"(b) It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7: . . . ." 61 Stat. 140–141, 29 U. S. C. (Supp. III) § 158 (b) (1) (A).

"SEC. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities . . . ." 61 Stat. 140, 29 U. S. C. (Supp. III) § 157.

[5] ". . . The Labor Management Relations Act declared it to be an unfair labor practice for a union to induce or engage in a strike or concerted refusal to work where an object thereof is any of certain enumerated ones. § 8 (b) (4) . . . . While the Federal Board is empowered to forbid a strike, when and because its purpose is one that the Federal Act made illegal, it has been given no power to forbid one because its method is illegal—even if the illegality were to consist of actual or threatened violence to persons or destruction of property." *International Union* v. *Wisconsin Board,* 336 U. S. 245, 253.

[6] In this Act "Congress safeguarded the exercise by employees of 'concerted activities' and expressly recognized the right to strike." *International Union* v. *O'Brien,* 339 U. S. 454, 457; see also, *Amal-*

"Nothing in this Act, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right." 61 Stat. 151, 29 U. S. C. (Supp. III) § 163.

By § 13, Congress has made it clear that § 8 (b) (4), and all other parts of the Act which otherwise might be read so as to interfere with, impede or diminish the union's traditional right to strike, may be so read only if such interference, impediment or diminution is "specifically provided for" in the Act.[7] No such specific provision in § 8 (b) (4) reaches the incident here. The material legislative history supports this view.[8]

---

*gamated Assn. of Employees* v. *Wisconsin Board,* 340 U. S. 383, 389, 404; *United Electrical & Machine Workers,* 85 N. L. R. B. 417, 418; *Oil Workers International Union,* 84 N. L. R. B. 315, 318–320.

[7] See also, the protection given to the right to engage in concerted activities by § 7 of the Act, note 4, *supra.* As to both §§ 13 and 7, see *International Union* v. *Wisconsin Board, supra,* at 258–264.

The character of the problem of reconciliation of the right to strike with the limitations expressed in § 8 (b) (4) is not unlike that which confronted the Court in *Allen Bradley Co.* v. *Local Union No. 3,* 325 U. S. 797, 806:

"The result of all this is that we have two declared congressional policies which it is our responsibility to try to reconcile. The one seeks to preserve a competitive business economy; the other to preserve the rights of labor to organize to better its conditions through the agency of collective bargaining. We must determine here how far Congress intended activities under one of these policies to neutralize the results envisioned by the other."

[8] Senator Taft, Chairman of the Senate Committee on Labor and Public Welfare, and floor manager for the bill in the Senate, said: "So far as the bill is concerned, we have proceeded on the theory that there is a right to strike and that labor peace must be based on free collective bargaining. We have done nothing to outlaw strikes for basic wages, hours, and working conditions after proper opportunity for mediation." 93 Cong. Rec. 3835. Similar state-

On the single issue before us, we sustain the action of the Board and the judgment of the Court of Appeals, accordingly, is

*Reversed.*

---

ments by Senator Taft appear at 93 Cong. Rec. 3838, 4198, 4867, 6446, 7537. Several other members of the Committee expressed like views: Senator Ellender at 93 Cong. Rec. 4131–4132; Senator Ball at 4834, 4838, 7529–7530; Senator Aiken at 4860; and Senator Morse at 4864, 4871–4873.

See also, "the primary strike for recognition (without a Board certification) is not proscribed." S. Rep. No. 105, 80th Cong., 1st Sess. (Pt. 1) 22, and see H. R. Rep. No. 510, 80th Cong., 1st Sess. 43.

In discussing the effect of § 8 (b) (4), and in showing its application only to circumstances other than those involved in this case, Senator Taft said further:

"The Senator will find a great many decisions . . . which hold that under the common law a secondary boycott is unlawful. . . . under the provisions of the Norris-LaGuardia Act, it became impossible to stop a secondary boycott or any other kind of a strike, no matter how unlawful it may have been at common law. All this provision of the bill [§ 8 (b) (4)] does is to reverse the effect of the law as to secondary boycotts." 93 Cong. Rec. 4198.