266 F.2d 365
 CARPENTERS UNION, LOCAL 131; Carpenters Union, Local 1289; Seattle District Council of Carpenters, affiliated with The United Brotherhood of Carpenters and Joiners of America, AFL-CIO; Teamsters, Chauffeurs and Helpers, Local Union No. 174, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; International Union of Operating Engineers, Local 302, AFL-CIO; and Local 404, International Hod Carriers, Building and Common Laborers' Union of America, AFL-CIO, Appellants,
v.
CISCO CONSTRUCTION CO., an Oregon corporation, Appellee.
 No. 15593.
 United States Court of Appeals Ninth Circuit.
 April 13, 1959.
 
 COPYRIGHT MATERIAL OMITTED Samuel B. Bassett, Bassett, Davies & Roberts, Seattle, Wash., for Carpenters Union, Local 131, and others.
 L. Presley Gill, Seattle, Wash., for appellant Union of Operating Engineers, Local 302, AFL-CIO.
 Roy E. Jackson, Seattle, Wash., for appellant Int. Hod Carriers, Building & Common Laborers' Union of America, Local 440, AFL-CIO.
 McDonnell Brown, Portland, Or., Hugo Metzler, Jr., Tacoma, Wash., for appellee.
 Before POPE, FEE and CHAMBERS, Circuit Judges.
 CHAMBERS, Circuit Judge.
 
 
 1
 Cisco, the general contractor, mainly makes its case seeking damages[1] for unfair labor practices[2] (committed by five locals and a labor council) from pressure conduct away from two job sites and usually at the places of business of Cisco's subcontractors. This "secondary" activity supplemented a stationary picket line at the job sites and roving picketing following Cisco's trucks established by a local of the carpenters' union.
 
 
 2
 Cisco had no contract with any union. It had contracts and "arrangements" with a number of subcontractors all of whom except one operated "union" shops. It had two separate United States army contracts at sites in Washington — the Redmond project and the Young's Lake project.
 
 
 3
 Generally, it may be said that the away-from-the-job site pressure, if it must be kept uncommingled with the job site picketing, did no substantial damage. The damage which Cisco did suffer would appear to have been caused because the subcontractors' union men just would not cross the picket lines at the job sites. The trial court expressly found that the first picket line as originally established was not illegal. And we think it implicit in the court's decision, findings of fact and conclusions of law, that if there had been nothing more than picketing, without the addition of other activity directed at or through the subcontractors, then recovery might have been denied. So it appears that the primary question here is whether we may take a concept of the totality of effort, charging all damage to defendants.
 
 
 4
 To us, the resolution of the problem mainly depends on how one reads four successive cases of the Supreme Court in the October Term, 1950. The cases are N.L.R.B. v. International Rice Milling Co., Inc., 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1284; N.L.R.B. v. Denver Building & Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284; International Brotherhood of Electrical Workers v. N.L.R.B., 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299; and Local 74, United Brotherhood of Carpenters & Joiners of America v. N.L.R.B., 341 U.S. 707, 71 S.Ct. 966, 95 L.Ed. 1309. From our analysis of these cases, we conclude that the defendants may be judged by their total activity during a period of time, provided the illegal activity is not de minimis.
 
 
 5
 The story of the trouble of the parties here begins on October 28, 1954, when the carpenter defendants (primarily the Seattle District Council) established pickets at the Redmond project. Picketing began a few days later at Young's Lake. The banners of the pickets read: "Cisco Construction Company unfair to wages and working conditions — District Council of Carpenters A.F.L." Also, roving pickets in cars followed Cisco's trucks, mainly back and forth from job site to the Cadman sand and gravel plant. The picketing continued until the jobs were completed late in 1955. All picketing seems to have been in the name of and actively directed by the district council of carpenters. There were minor and sporadic incidents of picketing occurring in the vicinity of two plants of subcontractors.
 
 
 6
 The work requiring carpenters was principally to be done by the general contractor and their place on the building schedule was much earlier than that of the trades of most of the subcontractors with their iron and metal workers, plumbers, electricians and painters.
 
 
 7
 As to Cisco, none of the defendants was a "bargaining representative" as defined by the Taft-Hartley Act. The first picketing began at Redmond after a carpenters' business agent approached the management of Cisco complaining that the employees on the job (some of whom were union carpenters) were not receiving overtime pay, certain transportation pay, and such fringe benefits as payments to the welfare funds of their unions, payments of the type that were ordinarily made by members of the Associated General Contractors of whom Cisco, an Oregon corporation, was one. Cisco was not ready to, and never did, accede to these demands. As a result, principally of the picket lines, Cisco could not get any of the subcontractors (except electrical which was nonunion) with their workers on to the job sites. Most of the subcontractors had signed written contracts with Cisco. Some subcontractors tested the picket line. When their union men turned back, they made no effort to force them to cross. Others did not even attempt to do that which was obviously useless. Gravel, sand, and mixed concrete were under subcontracts with "union" contractors and so were other segments of the job. The subcontractors would have made their own deliveries. As it was, Cisco had to take delivery in trucks it had leased and manned with nonunion drivers. Cisco had to find nonunion carpenters, painters, plumbers, iron and metal workers, machine operators and common labor to do behind the picket lines the work which ordinarily the subcontractors' union men would have done. There were many months of delay in completing the projects and the cost ran many thousands of dollars beyond the contract prices and Cisco's estimates. The defendants produced testimony to the effect that the whole loss was due almost entirely to bad management. But Cisco had a version which placed the fault of almost all of the delay on the defendants. Its witnesses said Cisco was hurt by difficulties and delays in getting men and by getting men unskilled for jobs they were undertaking to do. Then there was an unusually high turnover of men due, it said, to necessity to discharge many men who proved unsuitable. The only real means of getting men was by advertisements in newspapers. The trial court was unwilling, on the evidence, to trace all of the losses and delays to the defendants. But believing that there was substantial damage chargeable to the defendants and announcing that it found the damage from defendants' act to be "not less than $75,000," judgment was therefore ordered in that amount.
 
 
 8
 There was activity of business agents of the defendants on the secondary front with the subcontractors, which was obviously credited by the trial court, that shows a concert of action among the defendants to bring pressure on those who had no dispute with defendants to cause them to cease doing business with it. These acts consisted of one or two, usually two, agents of various defendants either bringing pressure on the workmen of the subcontractors or on the subcontractors directly to stop doing business with the plaintiff. If the agents of defendants had been credited on the stand by the court the agents were doing nothing except "trying to be helpful." If the trial court had ascribed substantial damage to these secondary or backyard activities, which it must have thought were quite real, then a greater detailing of facts would be appropriate. But as it is, we believe it sufficient to say on the evidence most favorable to Cisco, which view must be taken because of the findings below, these activities away from the job site show the concert of all defendants, that the acts were rather aggressive and calculated to cause others than carpenters to cease doing business with Cisco.
 
 
 9
 Judgment having been entered against the defendants, they have appealed.
 
 
 10
 The defendants' first point is that the case should be remanded for the trial court to make sharper findings. Of course, the purpose of findings is to tell someone else how the court reached its decision. Whether this court was wrong or right in its decision in Irish v. United States, 9 Cir., 225 F.2d 3, (relied on by defendants) there was an uncertainty there among the appellate judges as to how the trial court had reached its decision. Therefore, this court asked the trial court to make additional findings. Here it seems all too apparent that the defendants have been held liable by the trial court not for actual damage from the activities away from the job site but because of difficulties mainly at or behind the picket line. But the court has allowed the plaintiff to totalize defendants' concerted effort and the bad to infect that which was originally good. We take the view that the trial court has already done what defendants want us to force the trial court to do more explicitly. Taking this view, sending the case back for further findings would be a useless act.
 
 
 11
 The Rice Milling, the Denver Building, the Electrical Workers and the Carpenters Union cases, cited supra, all arise under Section 8(b)(4) of the Labor-Management Relations Act and began as proceedings before the N.L.R.B. However, Section 303 used here, is the identical twin for use in civil actions for damages where there is secondary activity.
 
 
 12
 Of course, if the activities of the defendants must be strictly compartmentalized and the activities treated as wholly severable, then this court could be wrong. (Still it would always appear that the purposes of the original picket lines at a very early date acquired the secondary object as something very much in the forefront.) To us it seems that one of the purposes of the Taft-Hartley Act was to permit a union to picket and to strike without interruption so long as it played the game fair and "according to the book." But the right is unfair if there is wholesale violence on the picket line (there was not here) or if the union vigorously sets out in a concerted effort to keep other subcontractors from doing business with the contractor. Although in Rice Milling, it was held there was no concerted conduct, it would seem the following extracts, 341 U.S. 665 at page 671, 71 S.Ct. 961, at page 964, 95 L.Ed. 1284 are apposite: "* * * The limitation of the complaint to an incident in the geographically restricted area near the mill is significant, although not necessarily conclusive. * * * A union's inducements or encouragement reaching individual employees of neutral employers only as they happen to approach the picketed place of business generally are not aimed at concerted, as distinguished from individual conduct by such employees. Generally, therefore, such actions do not come within the proscription of § 8(b) (4), and they do not here." (Emphasis supplied.)
 
 
 13
 Perhaps the strongest case for plaintiff is the Denver Building Council. There the principal activity was a nonviolent picket line. The general contractor and most of the subcontractors were "union" companies with no difficulties of their own with the building council. But there was an electrical subcontractor on the job who operated nonunion. The board found the purpose of the pickets was to get the electrical company off of the job by bringing pressure on the general contractor and the other subcontractors. This was held to be a wrongful object. So in Cisco's troubles it would appear that the initial object of better conditions for carpenters became one of forcing Cisco to do more than to improve the lot of carpenters on the job. But most important the means became too aggressive although they remained nonviolent. The efforts aimed at subcontractors took on a substantial character far beyond incidental. If a picket line at the job can take on an unfair objective, it would seem to follow that one at the job can be spoiled because of away-from-the-job activity.
 
 
 14
 The Electrical Workers case is quite similar to the Denver case. Nothing could have done the union general contractor any damage except the picket line. While not a damage case, the picket line supplemented by some activity away from the job site was held illegal. So the test is not merely: Is there a picket line? But: What is the object and what is the whole situation?
 
 
 15
 Again the Carpenters Union case involved a picket at a subcontractor's place of business, plus activity of union agents at the job site. There was no picket at the job site. Doubtless the pickets at the place of business, without more, did not violate any provision of the Labor Management Act. But the object of the totality of action resulted in the finding of an unfair labor practice on the part of the union. The statute was not effective until after the picketing began, but the original lawful action was held to have become illegal after the act. Some legitimate objectives did not save the activity from being a violation of law.
 
 
 16
 In our view, United Brick & Clay Workers v. Deena Artware, 6 Cir., 198 F.2d 637, supports our conclusion that the totality of the effort may be considered and shows that when one of the real objects becomes to reach the contractor through an innocent third party (by concerted action, of course) then he who has suffered may recover. The finding of concert of action in Cisco's case was not required, but certainly on the evidence was not error.
 
 
 17
 Defendants specify certain rulings on the admission of evidence. We have carefully gone over the rulings and find no reversible error. In one instance evidence was admitted without objection, but later made the subject of a motion to strike. In another instance it was only cumulative evidence, even if it should have been rejected. Certain exhibits were admitted over objection as not being properly identified. We are convinced the exhibits come well within the shop book rule. See 28 U.S.C.A. § 1732. There was some valid argument that the exhibits shouldn't be given much weight. But that was up to the trial court.
 
 
 18
 Objection also is made to the fact that the trial court adopted by reference certain findings made by the National Labor Relations Board in the parallel unfair labor practice "cease and desist" case. Our examination of the findings convinces us that the trial court did not accept the findings as a matter of res judicata but as a shorthand method of relating that it too found the same thing. The key portion attacked reads as follows:
 
 
 19
 "* * * [T]he conduct of defendants by their agents directed at plaintiff's subcontractors and their employees is set forth in detail in the reported National Labor Relations Board decision, Seattle District Council of Carpenters, et al., and Cisco Construction Company, 114 NLRB 27, Case No. 19-CC-72, dated September 9, 1955, which said findings in said decision and report are adopted by this Court herein and by this reference are made a part of these findings of fact; * * *"
 
 
 20
 The judgment is affirmed.
 
 
 
 Notes:
 
 
 [1]
 The action was brought under Sections 301 and 303 of the Labor Management Relations Act of 1947, 29 U.S.C.A. §§ 185, 187. Section 303 is commonly referred to as one of the secondary boycott provisions. In pertinent part the latter section reads as follows:
 "(a) It shall be unlawful * * * for any labor organization to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to * * * work on any goods * * * or to perform any services, where an object thereof is
 "(1) forcing or requiring any employer * * * to cease using * * * or otherwise dealing in the products of any other producer * * * or to cease doing business with any other person;
 "(2) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees * * *;
 "(3) forcing or requiring any employer to recognize or bargain with a particular labor organization * * *;
 "(4) forcing or requiring any employer to assign particular work to employees in a particular labor organization * * *.
 "(b) Whoever shall be injured in his business or property by reason of any violation of subsection (a) of this section may sue therefor in any district court of the United States * * * without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit."
 The Labor Management Relations Act, commonly known as the Taft-Hartley Act, was adopted as Public Law 101 of the 80th Congress. See 1947 U.S. Code Congressional Service, p. 135 et seq.
 
 
 [2]
 No minimum amount of damage or diversity of citizenship is required. See United Brick & Clay Workers v. Deena Artware, 6 Cir., 198 F.2d 637, cited infra. However, diversity of citizenship probably existed in this case