278 F.2d 282
 LOCAL 761, INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
General Electric Company, Intervenor.
 No. 15205.
 United States Court of Appeals District of Columbia Circuit.
 Argued February 16, 1960.
 Decided April 18, 1960.
 
 Mr. Benjamin C. Sigal, Washington, D. C., with whom Mr. David S. Davidson, Washington, D. C., was on the brief, for petitioner.
 Mr. Melvin J. Welles, Atty., N. L. R. B., of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Messrs. Thomas J. McDermott, Associate Gen. Counsel, N. L. R. B., and Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., were on the brief, for respondent.
 Mr. Gerard D. Reilly, Washington, D. C., for intervenor.
 Before PRETTYMAN, Chief Judge, and WILBUR K. MILLER and DANAHER, Circuit Judges.
 DANAHER, Circuit Judge.
 
 
 1
 Respective counsel for Petitioner (Union) and the Respondent (Board) stipulated that the sole issue may be stated thus:
 
 
 2
 "Whether, under the circumstances of this case, the Board properly concluded that petitioner by picketing Gate 3A of the General Electric `Appliance Park' plant at a time when General Electric was engaged in a labor dispute with the petitioner violated section 8(b) (4) (A) of the National Labor Relations Act, as amended."[1]
 
 
 3
 The Union has asked us to review and set aside, and the Board asks enforcement of, its order that the Union cease and desist from inducing or encouraging the employees of certain named contractors "or any other employer, except General Electric Company" to engage in a strike or a concerted refusal in the course of their employment to perform certain work or services where an object is to force or require such employers "or any other employer or person, to cease doing business with General Electric Company."
 
 
 4
 Intervenor, General Electric (Company) maintains a manufacturing plant at Appliance Park, Louisville, Kentucky, where it produces automatic washers, driers, dish washers and other household appliances. The Company during 1957 shipped in interstate commerce finished products valued in excess of $10 million. Some 13 plant buildings are located on a 1,000 acre tract, substantially square, with about 6,600 feet to the side. Surrounding the area is a ditch of such width and depth that vehicles can enter and leave the premises only on five roadways across culverts. At the entrance and on either side of each roadway are metal stanchions, between which a chain may be fastened to block the movement of vehicles during night hours and on non-working days. These entranceways numbered 2, 3, 3A, 4 and 5, are herein called "gates." To various classes of vehicles the Company's plant protection department, years before the events here critical, had issued stickers of varying size, shape and color. Each vehicle, whether that of a Company employee, or an employee of a contractor, a supplier or the like could readily be identified by the plant guards simply by examination of the type of sticker carried on the windshield. Employees of the Company had been authorized to use Gates 2, 3, 4 and 5, but not Gate 3A.
 
 
 5
 The Union in July, 1958 called a lawful strike against the Company. At that time the Company had some 10,500 employees at Appliance Park, of whom substantially more than one-half (possibly 7,600) were production and maintenance employees for whom the Union had been certified as bargaining representative. Picketing immediately commenced at all gates, including Gate 3A. The picketing was peaceful, the pickets carrying signs reading:
 
 
 6
 "Local 761 On Strike G. E. Unfair"
 
 
 7
 The Company kept the plants open, and it was found that more than 2,000 employees represented by the Union continued to work during the strike as did many others not within the bargaining unit.
 
 
 8
 The Company at that time had outstanding various contracts with some 12 employers. Their jobs included installation, repair and alteration of equipment, converting machinery for products changeovers, retooling, rearrangement of conveyors, installation of presses and the like. Some employers were constructing a truck dock, erecting an air shelter, and laying in a mezzanine floor in one of the plant buildings. General maintenance work beyond the skills or the available manpower of the Company personnel engaged for that purpose was also let to outside contractors. Some of the work in the various collateral lines had been the subject of such contracts over a period of years.
 
 
 9
 In earlier experience, some 22 jurisdictional disputes among the craft union employees of the various contractors had resulted in picket lines at gates normally used by the Company employees, thus keeping out the General Electric employees as well as those of the contractors. By 1954, the Company had issued written instructions to its plant security people that use of Gate 3A was to be limited to the independent contractors and their employees, in order to eliminate interference with access by Company employees. Likewise, all contractors and their employees had been instructed to enter and to leave the Company premises only through Gate 3A. Thus, the Company had established Gate 3A for the sole and separate use of the contractors and their employees at a point some 550 feet from the next nearest gate.
 
 
 10
 For some years signs at Gate 3A had carried posted notices of the limitation on permitted use, and at least since January, 1958, a large sign erected there had read:
 
 
 11
 "Gate 3-A For Employees Of Contractors — Only — G. E. Employees Use Other Gates"
 
 
 12
 The trial examiner's discussion of the case, he said, was "based upon the premise that Gate 3-A was reserved exclusively for contractors, their employees and suppliers, and that the Respondent [Union], in picketing at that Gate, did not seek to solicit any of the Company's employees to cease work." Also he concluded that while the Union's appeal at Gate 3A was to secondary employees only, i. e., to employees of persons other than General Electric, the Union picketing there was part of "traditional primary strike action," and hence was for the same lawful object as the picketing at the other four gates. He recommended that the unfair labor practice complaint be dismissed, having concluded that section 8(b) (4) (A) does not protect the business of a neutral employer within the situs of a primary dispute.
 
 
 13
 The Board substantially adopted the findings of the trial examiner, but disapproved his opinion that the picketing at Gate 3A was "traditional" and was protected by the Act.
 
 
 14
 The Board found from the record as a whole that only the neutral contractors' employees were permitted to use Gate 3A as the Union was well aware. The Board concluded that the Union's object in picketing at Gate 3A was to "enmesh these employees of the neutral employers in its dispute with the Company. Such purpose is shown not only by the picketing at gate 3-A but also by the oral appeals to the employees of neutrals not to cross the picket line." The Board therefore based its order on its conclusion that: "the Respondent violated Section 8(b) (4) (A) of the Act by inducing and encouraging the employees of independent contractors to engage in a concerted refusal to work with an object of forcing the independent contractors to cease doing business with the Company."
 
 
 15
 We think the Board has correctly evaluated the findings of the trial examiner as well as its own. In any of these secondary boycott situations the ultimate determination turns upon the union's objective. Often "The line is fine,"[2] and circumstances of the particular case must supply the answer to which way the chips are to fall. Here the question may be stated: was it an object of the strike to induce or encourage the employees of the several contractors — not of the primary employer — to engage in concerted refusal in the course of their employment to perform their own work or to render services so that their employers would cease doing business with General Electric?
 
 
 16
 In the Seafarers case now relied upon by the Union, we considered such questions and found the union's exercise of its section 13[3] rights was not in violation of section 8(b) (4) (A). There, however, the pickets (1) identified themselves specifically as striking only their primary employer, (2) proclaimed by signs clearly showing that they had no dispute with the secondary employer, (3) distributed leaflets which explained in detail not only their own purpose and the reason picketing was conducted at the particular location, but especially excluded the secondary employer and its employees. Moreover the primary employer had placed its ship in the secondary employer's yards and only thereafter were its employees withdrawn; the ship had no other berth at which the union's organizational efforts might be publicized; and the vessel normally was at sea, months on end, with its crew shifts rotated and transported back and forth by helicopter. The operations as conducted by the primary employer not only had precluded the possibility of picketing the ship directly, but as evidence of the employer's purpose, the primary employer during the night placed a crew aboard the vessel and towed it away. Such circumstances and such conduct, we concluded, made it clear that the union intended — not to shut down the neutral's operations, but to conduct lawful strike activities against the primary employer for the achievement of a protected objective.
 
 
 17
 The situation here is vastly different. When the strike was called in July, 1958, the Union picketed all gates, including 3A. "Most, if not all, of the independent contractors' employees refused to cross the picket line, and did not work during the strike," the Board found. Pickets at Gate 3A in some cases refused neutral employees permission to get their tools. Others were told to get passes at the Union office. Others were told, in effect, to "Go on home." There was no showing that Company employees made any attempt to utilize Gate 3A. We need not detail additional items.[4] It is sufficient to note that the Board's findings do not lack support in substantial evidence on the record considered as a whole, and we are bound by those findings.[5]
 
 
 18
 This was no case of a union's seeking "to influence two employees of a customer of the mill not to cross the picket line."[6] Rather, the Board reasonably could find, as it did find, that the Union by peaceful picketing to be sure, but effectively nonetheless, sought to encourage the employees of the independent contractors to engage in a concerted refusal to perform any services for their employers in the course of their employment and thus to force their employers to cease doing business with the Company.[7]
 
 
 19
 The objective of the picketing at Gate 3A as so found by the Board brings this case within the statute's range.[8] The "fine" line must be drawn in favor of the Board's order.
 
 
 20
 The order of the Board will be enforced.
 
 
 
 Notes:
 
 
 [1]
 61 Stat. 141 (1947), 29 U.S.C.A. § 158(b) (4) (A)
 
 
 [2]
 Seafarers International Union, etc. v. N. L. R. B., 1959, 105 U.S.App.D.C. 211, 216, 265 F.2d 585, 590
 
 
 [3]
 61 Stat. 151 (1947), 29 U.S.C.A. § 163 (1958)
 
 
 [4]
 One Company employee testified that he had been permitted by a guard to enter that gate on one occasion after January, 1958. No others were shown to have done so. It fairly may be concluded that Company employees all but exclusively entered the premises at gates reserved for them. On the other hand, numerous employees of many independent contractors for years had been using only Gate 3A
 
 
 [5]
 Universal Camera Corp. v. National Labor Relations Bd., 1951, 340 U.S. 474, 493, 71 S.Ct. 456, 95 L.Ed. 456
 
 
 [6]
 National Labor Relations Board v. Denver Bldg., etc., Council, 1951, 341 U.S. 675, 687, 71 S.Ct. 943, 95 L.Ed. 1284, interpreting the situation in National Labor Relations Board v. International Rice Milling Co., 1951, 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1277
 
 
 [7]
 International Brotherhood of Electrical Workers, etc. v. National Labor Relations Board, 1951, 341 U.S. 694, 701, 71 S.Ct. 954, 95 L.Ed. 1299; National Labor Relations Board v. Denver Bldg., etc., Council, 1951, 341 U.S. 675, 689, 71 S.Ct. 943, 95 L.Ed. 1284; Retail Fruit & Veg. Clerks Union v. N. L. R. B., 9 Cir., 1957, 249 F.2d 591, 599; cf. Truck Drivers & Helpers, etc., v. N. L. R. B., 1957, 101 U.S.App.D.C. 420, 249 F.2d 512, certiorari denied 1958, 355 U.S. 958, 78 S.Ct. 543, 2 L.Ed.2d 533
 
 
 [8]
 And see Aaron, The Labor-Management Reporting and Disclosure Act of 1959, 73 Harv.L.Rev. 1086, 1113, 1114 (1960). Section 707, 73 Stat. 546, 29 U.S.C.A. § 160 note, makes it clear that the 1959 Act has no applicability to the situation here