UNITED STEELWORKERS OF AMERICA, AFL–CIO

and

Laurel Hill Refinery Workers Union, Local No. 4355, United Steelworkers of America, AFL–CIO, and Its Agent, Jack W. Clark, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 137, Docket 26252.

United States Court of Appeals
Second Circuit.

Argued Jan. 5, 1961.

Decided May 3, 1961.

Jerry D. Anker, Arthur J. Goldberg, Washington, D. C. (David E. Feller, Washington, D. C., Samuel L. Rothbard, Abraham L. Friedman, Rothbard, Harris & Oxfeld, Newark, N. J., on the brief), for petitioners.

Melvin J. Welles, Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Judith Bleich Kahn, N. L. R. B., Washington, D. C., on the brief), for respondent.

Before LUMBARD, Chief Judge, and MAGRUDER * and WATERMAN, Circuit Judges.

LUMBARD Chief Judge.

■ The question for decision is whether the Union, which was engaged in a lawful strike against the Phelps Dodge Refining Corporation [hereafter Phelps Dodge], committed an unfair labor practice under § 8(b) (4) (A) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 158(b) (4) (A), by picketing an entrance gate to the Phelps Dodge plant which Phelps Dodge had reserved for the exclusive use of the employees of several contractors who were constructing a gas handling and dust collecting device necessary to bring the plant into compliance with the requirements of the New York City Board of Air Pollution Control. Considering the location of the gate, the relationship between Phelps Dodge and the independent contractors, and the nature of the work being performed by those contractors, we hold that the labor statute prohibits such picketing even though it took place at the premises of the struck employer.

The labor dispute occurred during the summer of 1959 in Maspeth, New York, where Phelps Dodge has a copper ore refinery. Local 4355 of the United Steelworkers of America [hereafter referred to as the Union [1]], represented the approximately 1,000 production employees of Phelps Dodge.[2] During July, Phelps Dodge and the Union engaged in fruitless negotiations for a new contract which were broken off on July 31 after an impasse had been reached. On August 3, the Monday following July 31, the Union put pickets at all gates to the refinery including the one reserved for the employees of the independent contractors to whose activities we now turn.

In April 1959, Phelps Dodge had decided to construct a new gas handling and dust collecting system that would conform the refinery to the requirements of the New York City Board of Air Pollution Control. The company contracted with several contractors each of which was to perform some portion of the work; all of these contractors had begun work by August 3, when the Union began to picket.

The contractors and their employees at first entered the Phelps Dodge plant at a gate which was also used by the Phelps Dodge production employees represented by the Union. Approximately a week before the picketing began, however, Phelps Dodge had a new gate cut in the chain-link fence which surrounded its plant. A sign facing out reading "CONTRACTORS ONLY" was affixed to the gate and the contractors were told that in the event of the strike they were to use the new gate and that no regular employees were to use the new gate.

The new gate was cut into the southeast corner of the fence at a point diago-

---

* Sitting by designation.

1. Joined with Local 4355 as petitioners in this action are its agent, Jack W. Clark, and the United Steelworkers of America.

2. In addition to the production employees Phelps Dodge employed twenty-five men who maintained the refinery's power plant and who were represented by the International Union of Operating Engineers, and some sixty clerical and supervisory employees who belonged to no union.

nally opposite the established gates. It was approximately 440 feet as the crow flies and 1,200 feet by road from the gate generally used by the Phelps Dodge employees. It was slightly closer to three other gates which were in the north edge of the fence. The record does not establish whether the contractors' gate could be seen from any other gates.

On July 31, during the last negotiation meeting preceding the strike, Phelps Dodge's chief negotiator told the Union that the gate had been cut; that it was to be used by the contractors and their employees; and that company employees would not be permitted to use it. The company then put guards at the gate whose function it was to see that no one but the contractors and their employees used the gate.

When the strike began, the Union placed pickets, carrying signs which read "On Strike, Phelps Dodge Local No. 4355, United Steelworkers of America, AFL–CIO," "Don't Scab" or "Keep Away," at the contractors' gate and the approaches thereto.[3] The Union was successful, as it was at the gate used by the Phelps Dodge employees, for most of the contractors' employees refused to cross the picket line and all construction work was thereupon shut down[4] until August 11 following a temporary injunction issued the day before by the United States District Court for the Eastern District of New York. Two days later, the general counsel for the Board filed the complaint which led to the Board's order here appealed from. The Board adopted the

findings and recommendations of its trial examiner and, ruling that the Union had violated § 8(b) (4) (A), ordered that it cease and desist from picketing the contractors' gate or the approaches thereto and that it post appropriate notices.

The Union's petition asks that the Board's order be set aside. The Board cross-petitions for enforcement of its order. 126 N.L.R.B. No. 168.

**I.**

At the time of the strike, § 8(b) (4) (A), which the Board held was violated when the Union picketed the contractors' gate, made it an unfair labor practice for a Union

"* * * to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to * * * perform any services, where an object thereof is: (A) forcing or requiring * * * any employer or other person * * * to cease doing business with any other person * * *"

The Union's conduct quite obviously comes within the statute; an object of the picketing at the contractors' gate was to induce the contractors' employees to refuse to work and thereby force their employers, the contractors, to cease doing business with Phelps Dodge.

However, the Union argues that the challenged picketing was primary and therefore lawful because it was done at the premises of Phelps Dodge, the primary employer whom the Union was at-

---

3. To reach the gate by automobile, the exclusive means of transportation used by the contractors and their employees, it was necessary to leave a main road and cross the Long Island Railroad tracks at Haberman's Crossing and then, after going down a dead-end road, take a right angle turn into a roadway which led to the contractors' gate. The Union picketed at Haberman's Crossing and at the roadway immediately leading to the contractors' gate as well as at the contractors' gate.

4. There was evidence, which the trial examiner and the Board credited, that mem-

bers of the Union, in addition to picketing, prevented anybody who might have wanted to cross the picket line from doing so by parking automobiles across the roadway and also by placing boards with protruding nails on the road. Though the Union says that it does not believe that these findings are supported by substantial evidence, it has not pressed the point. It contends that whether it committed these acts is not relevant to our consideration of whether the Union violated § 8(b) (4) (A). We agree. N. L. R. B. v. International Rice Milling Co., 1951, 341 U.S. 665, 672, 71 S.Ct. 961, 95 L.Ed. 1277.

tacking with a lawful strike. While the fact that picketing occurs at the premises of the primary employer is significant, cf. N. L. R. B. v. International Rice Milling Co., Inc., 1951, 341 U.S. 665, 671, 71 S.Ct. 961, 95 L.Ed. 1277, we do not believe that it is for that reason necessarily permissible. In some cases the policy of protection to neutrals will outweigh the policy preserving the Union's right to fight the industrial battle with traditional tools. We believe that this is such a case and we therefore enforce the Board's order.

As was pointed out in N. L. R. B. v. Denver Building & Construction Trades Council, 1951, 341 U.S. 675, 692, 71 S.Ct. 943, 95 L.Ed. 1284, we must draw the line between protected primary conduct and illegal secondary conduct[5] by balancing the dual Congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own.

It is true that there is language in the decisions, Pure Oil Co., 84 N.L.R.B. 315, 318–19 (1949); Ryan Construction Co., 85 N.L.R.B. 117, 418 (1949) [a contractors' gate situation]; Interborough News Co., 90 N.L.R.B. 2135 (1950); cf. Crump, Inc., 112 N.L.R.B. 311, 312 (1955), and annual reports of the Board, 18 Ann.Rep. N.L.R.B. 48 (1953); 16 Ann.Rep. N.L.R.B. 226 (1951), and in court decisions, Di Giorgio Fruit Co. v. N. L. R. B., 1951, 89 U.S.App.D.C. 155, 191 F.2d 642, 649, 28 A.L.R.2d 377, certiorari denied 1951, 342 U.S. 869, 72 S.Ct. 110, 96 L.Ed. 653; Local 618, etc. v. N. L. R. B., 8 Cir., 1957, 249 F.2d 332, 337–338, which states, without qualification, that in the course of a strike against the primary employer any concerted activity at the primary employer's premises, even that directed at the employees of neutrals, is permissible. But the Supreme Court has intimated, in a case not wholly analogous to this one, that some activity at the primary employers' premises falls within the ban of § 8(b) (4) (A), N. L. R. B. v. Denver Building & Construction Trades Council, 1951, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284. We think that the cases cited, though persuasive on their particular facts, (except for Ryan Construction)[6] are not applicable here; indeed the very differences between this and the cited cases point up the crucial aspects of this case which support the Board's order.

Pickets at the contractors' gate were not necessary to further the legitimate purposes of the strike against Phelps Dodge. It was not necessary to picket there in order to publicize the dispute to Phelps Dodge's employees and the general public. The contractors' gate was isolated from the one used by the Phelps Dodge employees and from all other gates and from any public thoroughfare. There was ample space where the Union could picket without affecting the contractors' employees. Compare Local 618, supra. Nor was there any need to picket there in order to prevent Phelps Dodge from carrying on the work usually performed by the striking employees, for the Union could picket the gates that Phelps Dodge employees or employees of neutral employers, coming to deliver or pick up the ordinary raw materials and products of the business, would have to use. Compare Pure Oil Co., supra; Interborough News Co., supra; Di Giorgio Fruit Co., supra.

Thus, unlike cases where there was only a single entrance to the struck premises or where the picketed entrance could be used by primary employees or

---

5. Cf. Senator Taft in 93 Cong.Rec. 4201 (April 29, 1947).

6. Ryan Construction involved picketing at a contractors' gate. It was ignored by the Board in General Electric Co., 123 N.L.R.B. 1547 (1959), aff'd sub. nom. Local 761, etc. v. N. L. R. B., 1960, 107 U.S.App.D.C. 402, 278 F.2d 282, certiorari granted 364 U.S. 869, 81 S.Ct. 114, 5 L.Ed.2d 92, and explicitly overruled in Virginia-Carolina Chemical Co., 126 N.L. R.B. 117 (1960) [petition for review pending in D.C.Cir.].

truckers on ordinary pick-up or delivery routes, the Union's picketing at the contractors' gate could have had only one objective and one effect. Cf. Local 618, supra, 249 F.2d at pages 337–338. It was solely designed to harm neutral employers doing business with the primary employer and thereby to coerce the primary employer by forcing the neutrals to cease doing business with it. It is from just such harm, where it is an avoidable and unnecessary consequence of the essential aims of a primary strike, that § 8(b) (4) (A) was designed to shield neutral employers.

It is important to note that the contractors in this case were truly neutral and were not the alter ego of the employer, taking over its ordinary business and benefiting from the strike. They were not an "ally" of the struck employer hired to do its everyday business in an effort to preserve its good will and perhaps its profits. Compare N. L. R. B. v. Business Machine and Office Appliance ètc., Workers, 2 Cir., 1955, 228 F.2d 553. Nor was the work they were engaged in of a kind that would have necessitated closing down or curtailing the activity at the plant so that by hiring them after the strike began or in anticipation of it, the employer was escaping from or mitigating the economic effect of the strike. Compare Local 618, supra. On the contrary, the contractors were constructing a capital improvement, and their work had gone on for several weeks before the strike without curtailing the ordinary plant operations.

The Union urges that to prevent picketing at a separate gate presents too many practical difficulties in deciding what activity is permitted and what is proscribed, since it cannot always tell what entrances are being used by primary employees. The trial examiner found that after the picketing at the con-

tractors' gate ceased, regular employees of Phelps Dodge never used the contractors' gate.[7] Of course unions are always at liberty to observe the various gates to see that none but contractors and their employees use them. There is no reason to suppose that the Union could not observe the contractors' gate at the Phelps Dodge plant.

The principles of the Board's ruling which we here enforce are not unduly difficult to understand or to put into practice. There must be a separate gate marked and set apart from other gates; the work done by the men who use the gate must be unrelated to the normal operations of the employer and the work must be of a kind that would not, if done when the plant were engaged in its regular operations, necessitate curtailing those operations.

## II.

The Union contends that the recent amendments to § 8(b) (4) make it clear that the picketing in this case was not an unfair labor practice under the old law and would not be one under the act as amended by the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C.A. § 158(b) (4) (B), as amended, and that we must consider this argument since the Board's order of March 13, 1960 was prospective in form and therefore forbade the picketing after the amendments went into effect on November 13, 1960. There is no merit to this contention. The language of the 1959 statute, "that nothing contained in [the secondary boycott clause] shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing," does not apply to this case because the Union's picketing was not "primary."

We deny the petition to set aside the Board's order, and grant enforcement of the order.

---

**7.** It appears that two trucks carrying supplies to the plant were mistakenly admitted through the gate. These were the only such incidents that occurred from August 3, 1959 until October 5, 1959, when the hearing before the trial examiner commenced.