**MISHARA CONSTRUCTION COMPANY, INC., Plaintiff-Appellant,**

v.

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO and Local Union No. 284, International Brotherhood of Electrical Workers, AFL–CIO, Defendants-Appellees.**

**Nos. 76–1410, 76–1411 and 76–1418.**

United States Court of Appeals, First Circuit.

Argued Jan. 5, 1977.

Decided May 3, 1977.

David C. Hawkins, Boston, Mass., with whom Withington, Cross, Park & Groden, Boston, Mass., was on brief, for Mishara Const. Co., Inc.

John D. O'Reilly, III, Framingham, Mass., and Arthur J. Flamm, Boston, Mass., with whom Letoile & O'Reilly, Framingham, Mass., and Flamm, Mason, Paven & Feinberg, Boston, Mass., were on brief, for International Brotherhood of Electrical Workers AFL–CIO, and Local 284, International Brotherhood of Electrical Workers, AFL–CIO.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, and BOWNES,* District Judge.

PER CURIAM.

The issue in this case is whether defendants, International Brotherhood of Electrical Workers, AFL–CIO and its Local Union 284 of Pittsfield, Massachusetts, violated the secondary boycott prohibition of the Labor Management Relations Act, 29 U.S.C. § 158(b)(4)(ii)(B), by threatening and coercing Philip Renzi & Sons, Inc. (Renzi) and Bernard Roy in order to get them to cease working as electrical subcontractors for the Mishara Construction Corporation (Mishara) during the construction of Rose Manor, a housing project for the elderly in Pittsfield, Massachusetts.

* Of the District of New Hampshire, sitting by designation.

Mishara instituted this action in March, 1971, seeking damages under 29 U.S.C. § 187 [1] for alleged violations by both defendants of the secondary boycott provision. The case was referred to a master in January, 1974, pursuant to Fed.R.Civ.P. 53. The sole issue before the master was the question of liability. In July, 1975, after twenty-two days of hearings, the master filed his report recommending that judgments enter for both defendants. Mishara objected to the report. The district court ruled that the report lacked sufficiently specific findings and remanded the case to the master in November, 1975, to make subsidiary findings. The master filed his subsidiary findings in March, 1976, still concluding that judgment should enter for the defendants. Mishara filed essentially the same objections again. The district court adopted the master's findings and subsidiary findings on June 17, 1976, and directed that judgment be entered for defendants.

Renzi was the electrical subcontractor to Mishara, the general contractor, at the Rose Manor construction site in Pittsfield, Massachusetts. The Rose Manor job, to put it mildly, was fraught with labor strife throughout its existence. Construction began late in 1966, and in April, 1967, the Carpenters' Union had a labor dispute with Mishara, struck the project, and set up picket lines. In June of 1967, Mishara replaced the striking carpenters with nonunion carpenters in an attempt to break the strike, but many of Mishara's other employees and those of its subcontractors, including Renzi's employees, were unwilling to cross the picket line.

The Carpenters' Union and Mishara agreed to submit the dispute to binding arbitration on September 11, 1967. A few days after the removal of the Carpenters'

picket lines, the Laborers' Union requested a contract. When it and Mishara were unable to reach agreement, the Laborers set up a picket line.

On the few days when there were no picket lines, Renzi's electricians went to work. On the first morning of the Laborers' strike, Renzi's electricians showed up outside the gate. They refused to cross the picket line, and they were told by Renzi's superintendent, Pigott, to go to another Renzi job site in the area.

On several occasions, electricians crossed the picket lines to perform various jobs for Renzi, but these jobs were mostly related to equipment maintenance or other work not intended to forward the project as a whole, but rather to maintain the status-quo.

Renzi frequently requested that Local 284 supply him with electricians. Local 284 and the International made efforts to find employees for Renzi, but they were not successful. They contend that there was a dearth of electricians for the many construction projects in the area at the time and that this was not the only project for which Renzi was having difficulty finding sufficient labor.

Two considerations stemming directly from the labor strife also hurt Renzi's attempts to find a sufficient work force: first, that union workers are reluctant to cross picket lines; and second, that the project's general labor problems posed the threat of shutdown at any time. Electricians who could find steady work elsewhere were more likely to ·take it rather than work at the Rose Manor job site.

Renzi made other attempts to find employees. Renzi's foreman, Pigott, went to some of the men at other Renzi jobs and

1. Section 187 provides:

"(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.

"(b) Whoever shall be injured in his business or property by reason of any violation of subsection (a) of this section may sue therefor in

any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit."

(For pertinent parts of section 158(b)(4) see footnote 2, *infra*.)

asked them to work at Rose Manor, but, to a man, they were unwilling. Pigott was not even able to convince men who had been laid off from another job to come to work at Rose Manor. Another Renzi representative Beaudoin, made attempts to find men in the Providence, Rhode Island area, but he was also unsuccessful.

Unable to man the job with union electricians, Renzi arranged to have a nonunion company from Boston, Rotman Electric, perform the electrical work from early January of 1968 until April 30 of that year. On April 30, Renzi sent a telegram to Mishara which indicated that one Bernard Roy, a nonunion electrical contractor, would take over the work.

Roy and his men began work on May 1, 1968. Donald Soule, who became the Business Manager for Local 284 on July 19, 1968, discovered that some of the workers were being paid less than scale. Renzi had a written contract with Local 99 of the IBEW in Providence, his home base, but did not have a written contract with Local 284 of Pittsfield. Soule charged Renzi with violation of section 10 of the Local 284 agreement, which is the same as that section of the Local 99 agreement.

On August 9, 1968, a joint conference committee consisting of four committee members, two from the union and two from the employers, met to consider the charges of substandard wages. Renzi did not contest the charges. Roy was terminated on August 21 and stopped working on August 22. Mishara terminated Renzi and employed Rotman to complete the work shortly after Roy's termination.

The master initially found that while there was no written agreement between Renzi and Local 284, the parties "acted under" an agreement which included the clause contained in section 10 of Local 284's standard contract. That section provides that

"[T]he subletting, assigning or the transfer of any work in connection with electrical work to any person, firm or corporation not complying with the terms of this Agreement by the Employer, will be sufficient cause for cancellation of this Agreement, after the facts have been determined by the International Office of the Union."

In his later subsidiary findings, the master did not retract his conclusion but somewhat confusingly said that "even if the parties at times acted as though there was an agreement, it would be impossible to reconstruct the terms of such a purported agreement from the actions of the parties." He went on to find, assuming the parties were bound by such an agreement, that the provision set out above was valid under the proviso created for the construction industry in 29 U.S.C. § 158(e) because it did not require subcontractors to recognize the union but only to maintain union terms or standards. The master observed, moreover, that even if the challenged language could be characterized as an unfair labor practice under 29 U.S.C. § 158(e), there was no evidence that the Local took any action to enforce the clause in violation of the secondary boycott provision: "The sole activity of the union with reference to the enforcement", he found, "was the use of the contractual grievance procedure of the joint conference committee." The ultimate conclusion of the master's report, adopted by the district court, was that there had been no "threats, restraints or coercive violations of Section 8(b)(4)(ii)(B) [29 U.S.C. § 158(b)(4)(ii)(B)]." [2]

**2.** The pertinent parts of 29 U.S.C. § 158(b)(4) are set out below:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

\* \* \* \* \* \*

"(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

\* \* \* \* \* \*

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or other-

On appeal, Mishara argues that the master's findings are factually erroneous and legally incorrect. It claims that the Local caused a violation of 29 U.S.C. § 158(b)(4)(ii)(B) by actually enforcing the cancellation provision in the purported agreement with Renzi. Indeed, according to Mishara, the mere existence in that agreement of a cancellation provision on its face violated the secondary boycott provision. And the Local's charges against Renzi before the grievance committee are said to have constituted a further violation. The International is alleged to have affirmatively supported the Local's actions throughout.

The secondary boycott provision of the Labor Management Relations Act, 29 U.S.C. § 158(b)(4)(ii)(B), prohibits strikes, picketing, threats, and other coercion aimed at an employer with whom a union has no labor dispute (a secondary employer) with the object of persuading or coercing the secondary employer to stop dealing with a primary party with whom the union does have a dispute, thereby forcing the primary party to meet the union's demands. Unions are prohibited from engaging in strikes, refusing to handle goods, or inducing another individual to strike or refuse to handle goods, and from threatening, or otherwise coercing, any person when the object is to force or require any person to cease doing business with any other person. The Supreme Court has held that the ambiguous phrase "any other person" means an innocent secondary employer and that the statutory prohibition only applies when employees of a secondary employer are induced to strike or, as is alleged in this case, to use other economic pressures against their employer in order to aid a union that has a dispute with another employer. *Local 761, International Union of Electrical, Radio and Machine Workers v. NLRB*, 366 U.S. 667,

672, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961); *NLRB v. International Rice Milling Co.*, 341 U.S. 665, 672, 71 S.Ct. 961, 95 L.Ed.2d 1277 (1951).

In the instant case, Mishara does not claim that defendants induced or coerced individuals working for Renzi or his subcontractor to boycott the Rose Manor job site. Rather, it focuses on an allegedly illegal clause in the purported agreement between Local 284 and Renzi under which the latter was supposedly coerced into terminating its work on Rose Manor. The master's findings on whether such an agreement was actually in effect are not a model of clarity. But this need not detain us. Even assuming, without deciding, that Renzi and Local 284 had entered into an agreement, express or implied, and—going further—that the cancellation provision contained in the agreement was an unfair labor practice not within the construction industry proviso to § 158(e), Mishara could not by reason of those facts alone, recover damages under § 187. Section 187 is triggered only by violations of § 158(b)(4). *See* note 1, *supra; cf. Local 1976, United Brotherhood of Carpenters v. NLRB (Sand Door)*, 357 U.S. 93, 107–08, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958). There is ample support for the master's findings that no such violations in fact occurred.

Mishara argues that the cancellation provision is inherently coercive and therefore violates the secondary boycott provision. It relies on *NLRB v. IBEW, Local 769*, 405 F.2d 159 (9th Cir. 1968) which held that in light of congressional intent limiting the enforcement of clauses falling within the construction industry proviso of § 158(e) to judicial means, the threat by a union representative to cancel the contract according to the cancellation clause was a violation of the secondary boycott provision. That case,

---

wise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the

representative of such employees under the provisions of section 9: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing; . . . . ."

however, stands on a different factual footing. The ninth circuit observed there that the union actually threatened to terminate under the cancellation clause. Here, the master found specifically: "There was no evidence of enforcement or threatened enforcement of the clause through cancellation." This finding is not clearly erroneous and we are bound by it. Fed.R.Civ.P. 52(a). Whatever the status under § 158(e) of this clause with its cancellation provision, we are not persuaded that the mere existence of such a clause, without more, amounts to coercive conduct violative of § 158(b)(4).

Mishara's final claim that the Local coerced Renzi by bringing charges against it before the grievance committee because of Roy's paying wages below union scale merits little discussion. The master observed that "the joint conference committee proceeding appears to be lawful and non-coercive" and we have no reason to question his conclusion. Mishara takes the position that the Local and Renzi had a contract, and we think that for a union to bring a grievance against such an employer would not be coercion in violation of the secondary boycott provision, but would have to be viewed as an acceptable first step before judicial remedies are invoked. *See NLRB v. IBEW, Local 769, supra*; *NLRB v. Local 217, United Association of Journeymen*, 361 F.2d 160 (1st Cir. 1966).

Because we affirm entry of judgments for both defendants on the grounds discussed above, we do not reach other issues which have been presented on appeal.

*Affirmed.*